570 A.2d 917

IN THE MATTER OF THE COMMITMENT OF EDWARD S.

Argued April 24, 1989—Decided March 8, 1990.

*Angela V. Passalacqua,* Assistant Deputy Public Advocate, argued the cause for appellant (*Alfred A. Slocum,* Public Advocate, attorney).

*James P. Lynch,* Assistant Prosecutor, argued the cause for respondent (*Samuel Asbell,* Camden County Prosecutor, attorney).

The opinion of the Court was delivered by

WILENTZ, C.J.

Edward S., having been found not guilty of murder by reason of insanity, was committed to the New Jersey State Forensic Hospital for the Criminally Insane. The issue in this case is whether subsequent hearings to determine whether he should be freed or remain committed may be open to the public or must be *in camera.* We hold that the statutory mandate requiring that such hearings be *in camera* where a civil committee is involved does not apply to one committed following a verdict of not guilty by reason of insanity (NGI committees). For similar reasons, we hold that our own court rule, tracking the statute, was not intended to mandate an *in camera* hearing for such committees.

We conclude further that where the charge was murder, the various interests involved are best accommodated by a rule presumptively requiring proceedings open to the public, and that the presumption is strong. Applying that holding to the facts of this case, future periodic hearings to determine whether Edward S. shall be freed shall presumptively be open to the public.

## I.

Edward S. lived in a boarding house for people suffering from mental disorders. The house was operated by Millie Ingram. On August 4, 1983, Edward stabbed Ms. Ingram to death with a butcher's knife. Testimony at a bench trial held on April 2, 1984, revealed that he "became delusional, thought he was God and was endowed with supernatural power to kill people. He had a delusion that the landlady was the devil who was going to kill Jesus Christ." The judge who presided over the trial and all subsequent hearings found Edward not guilty by reason of insanity and committed him to the New Jersey State Forensic Hospital for the Criminally Insane.

At a July 16, 1984, review hearing, the court ordered a transfer of Edward to Ancora Psychiatric Hospital. On September 28, 1984, as a result of another hearing, Edward was transferred to Greystone Park Psychiatric Hospital, where he is currently a patient. Along with those transfers, the court granted Edward increased levels of privileges. They included open-ward privileges, overnight visits to his parents, and escorted, off-grounds privileges for recreational trips and for drug and alcohol rehabilitation meetings.

The September hearing was held *in camera*. The court ordered the courtroom to be cleared. Although no members of the general public were present, decedent's family members were permitted to remain. A dispute exists over who attended subsequent periodic review hearings. The Assistant Prosecu-

tor states that since 1985, the decedent's family members and other members of the public attended the hearings. Counsel for Edward in the criminal trial certifies that at the periodic hearings when he represented Edward, only members of the decedent's family and Edward S.'s family were present. The Public Defender's Office subsequently represented Edward S. for the first time at a May 15, 1987, review hearing. That hearing was attended by Edward's parents, two members of decedent's family, and the testifying psychiatrist.

Prior to that May review hearing, counsel for Edward requested an *in camera* hearing pursuant to *Rule* 4:74-7(e), the rule governing ordinary civil commitments. It was the first time such a motion was made. The request was that those attending be limited to Edward's family, his doctor, and his Alcoholics Anonymous sponsor. The trial court denied the request and ruled that the hearing would be open to the public. The court found that although the commitment of one found not guilty by reason of insanity is to proceed on a civil basis,

> the cause and the reason for this hearing here today is so substantial, and there is such a public interest, that this Court finds that to deny those who are present, the members of the family, to hear the testimony, for them to hear how [Edward S.] is proceeding, and for them to understand whatever action the Court has taken, [would amount to taking away] ... an absolute right that they have.

The court supplemented that oral finding with a written determination that periodic review hearings for a committee found not guilty by reason of insanity should not be held *in camera*.

After this denial of her motion for an *in camera* hearing, counsel for Edward indicated that she could not proceed with the hearing due to the "substantial number of people that are in the courtroom in addition to Mrs. Ingram's family" without violating the confidentiality rights of her client. As a result, the court stayed the review hearing pending appeal. In the course of the attempted appeal, the statute was amended with the claimed effect of granting an absolute right to an *in*

*camera* hearing. At that point we granted Edward S.'s motion for leave to appeal.

## II.

Until 1975 neither our statutes nor court rules provided for *in camera* hearings for commitment proceedings. In 1974, Chief Justice Hughes issued a Memorandum to Assignment Judges and others designed to make uniform our civil commitment procedures throughout the State. The memorandum sets forth those procedures in some detail, including provisions for periodic review. It did not, however, mention anything about *in camera* hearings. As a result of that memorandum the Civil Practice Committee recommended a revision of the civil commitment rule (*Rule* 4:74–7) "to accord with the directive itself and with concepts of fundamental fairness and to foster uniform treatment of involuntary civil commitments throughout the State." The Committee's proposed rule went well beyond the Chief Justice's memorandum. The Court thereafter amended that rule largely in conformance with the recommendations of the Civil Practice Committee including, in somewhat different form, a provision for *in camera* hearings. Dealing solely with civil commitment proceedings, the rule as thus amended read: "The hearing shall be held *in camera* unless good cause to the contrary is shown." *R.* 4:74–7(e) (1975). That was the first appearance of an *in camera* provision.

Prior to that time there had been "a great divergence of practice ... in involuntary proceedings" (Hughes Memorandum) as well as "a longstanding history of procedural abuses in the civil commitment process," the purpose of the revised rule being to correct both and "to insure that no person may be involuntarily committed to a psychiatric institution without having been afforded full procedural due process." *Pressler, Current N.J. Court Rules,* Comment *R.* 4:74–7 at 1129 (1990). In New Jersey the welter of divergent practice did not deal

with whether hearings were open or *in camera*.[1] And proceedings to commit those found not guilty by reason of insanity were, inferentially at least, open to the public. That conclusion is based on the fact that at least from 1943 to 1975 the statute [2] required the jury's verdict to include not only its conclusion that defendant was not guilty by reason of insanity but a special finding on whether the insanity continued, *N.J.S.A.* 2A:163–3, resulting, without more, in defendant's commitment. Because the trial was public and the charge to the jury and its verdict apparently incorporated both the acquittal and the special finding of continued insanity (*see State v. Maik*, 60 *N.J.* 203, 217–19, 287 *A*.2d 715 (1972); *State v. Vigliano*, 43 *N.J.* 44, 61–62, 202 *A*.2d 657 (1964)), the "proceedings"—whatever it was that the jury heard leading to its special finding that the insanity continued—were presumably similarly public. *See also State v. Krol*, 68 *N.J.* 236, 344 *A*.2d 289 (1975) (clearly indicating the evidence on continued insanity (or future dangerousness) was part of the guilt trial). Indeed, the related proceeding, to determine whether insanity prevented a defendant from standing trial, *N.J.S.A.* 2A:163–2, also leading to commitment, was *required* to be in open court.

The first appearance of an *in camera* hearing requirement in New Jersey is a part of the history of increasing attention to the rights of persons suffering from mental illness. As doubts concerning the fairness of society's treatment of the mentally ill grew, legislative provisions affording greater protection were adopted, reflected in, and to some extent triggered by

---

[1]The civil commitment statute at one time authorized the court to "continue such final hearing in *open court* from time to time as may be necessary...." *L.* 1918, *c.* 147, § 416 (emphasis supplied).

[2]Actually, the statute referred to continued in that form until 1979 when it was repealed and replaced by *N.J.S.A.* 2C:4–8, but the practice of commitment by special verdict of the jury stopped after our decision in *State v. Krol*, 68 *N.J.* 236, 264–65, 344 *A*.2d 289 (1975). *Pressler, Current N.J. Court Rules*, Comment *R.* 3:19–2 (1980).

judicial decisions on the subject. The most basic change reject-ed "insanity" alone as justification for commitment: dangerous-ness to self or society became the standard. *Jackson v. Indiana*, 406 *U.S.* 715, 92 *S.Ct.* 1845, 32 *L.Ed.*2d 435 (1972). Accompanying that fundamental change were modifications designed to accord procedural due process to committees, in-cluding modifications that recognized the need for periodic review of the commitment to assure that if danger no longer existed, the committee would not be forever institutionalized for lack of inquiry. *O'Connor v. Donaldson*, 422 *U.S.* 563, 95 *S.Ct.* 2486, 45 *L.Ed.*2d 396 (1975). More to the point here, the difference in treatment of the mentally ill based on whether or not the illness was manifested in criminal conduct was constitu-tionally obliterated. *Jackson v. Indiana, supra*, 406 *U.S.* 715, 92 *S.Ct.* 1845, 32 *L.Ed.*2d 435; *Baxstrom v. Herold*, 383 *U.S.* 107, 86 *S.Ct.* 760, 15 *L.Ed.*2d 620 (1966).

Those developments led, in New Jersey, to Chief Justice Hughes' memorandum in 1974 concerning civil commitments and, shortly thereafter, to *State v. Krol, supra*, 68 *N.J.* 236, 344 *A.*2d 289, in which we held that those committed after a verdict of not guilty by reason of insanity were entitled to substantially the same treatment as civil committees, in particu-lar, that the standard for commitment was the same, followed three years later by *State v. Fields*, 77 *N.J.* 282, 390 *A.*2d 574 (1978), applying *Krol* and holding that NGI committees, like civil committees, were entitled to periodic review.

The appearance, then, of the "in camera" hearing require-ment for civil committees in our rules in 1975 can be understood as one of many manifestations of concern for the rights of those committed because of mental illness. As the commentary to the rule noted:

> The adoption of this rule reflects an increasing national and state-wide concern for the situation of persons suffering from mental illness and a growing realization that, traditionally, persons alleged to be suffering from mental illness have been involuntarily committed on *ex parte* orders entered without representation by counsel, without adequate notice, without adequate proofs, and generally in violation of the most fundamental concepts of due process.
>
> [*Pressler, Current N.J. Court Rules*, Comment R. 4:74–7 (1977).]

126

The *in camera* hearing preserves their privacy, their dignity, and is thought by some to afford a greater likelihood of a more candid evaluation and a lesser likelihood of the hearing interfering with future psychiatric treatment.

This aspect of procedural concern for committees was absent from our statutes until 1987. Those statutes, significantly amended in recent years, did not speak to the subject of the nature of the hearing at all. Nor did the completely independent criminal provisions concerning NGI committees. The major changes in the criminal provisions were intended to reflect the decisional requirements of equality of treatment between civil and criminal committees, manifested in the provisions of our Code of Criminal Justice that an NGI committee be "treated as a person civilly committed." *N.J.S.A.* 2C:4–8b(3).

It is important, in view of the issue before us, to trace the changes in our statutes and rules after the first appearance of an *in camera* provision in those rules in 1975. As noted above, that rule concerning civil commitments provided that hearings be *"in camera* unless good cause to the contrary is shown." At that time, the civil commitment *statute* had no such requirement, and the statute concerning criminal committees, NGI committees, was totally independent of the civil commitment statute. It provided simply for commitment on the jury's special finding that insanity continued. *N.J.S.A.* 2A:163–3. And *Rule* 3:19–2, the comparable rule of court concerning NGI committees, which refers solely to that statute, stated that "[i]f a defendant interposes the defense of insanity and evidence thereof is given at trial, the jury, if it acquits the defendant, shall find specially in accordance with *N.J.S.* 2A:163–3." After *State v. Krol, supra,* 68 *N.J.* 236, 344 *A.*2d 289, and *State v. Fields, supra,* 77 *N.J.* 282, 390 *A.*2d 574, however, the Code of Criminal Justice, adopted in 1978, effective September 1, 1979, provided for the first time that those found not guilty by reason of insanity and thereafter determined by the court to constitute a danger to the community or to self if released shall be

committed and thereafter "treated as a person civilly committed." *N.J.S.A.* 2C:4–8b(3). It is of considerable importance to note, as the Legislature presumably realized, that when it provided for that equivalency, namely, that NGI committees be treated as a person civilly committed, such treatment included, by rule only, an *in camera* hearing "unless good cause to the contrary is shown." Shortly thereafter, in conformance with that statutory change, we amended our court rule concerning NGI committees to provide that on the return of a verdict of not guilty by reason of insanity, "the procedure for disposition of the defendant shall be as provided for by *N.J.S.A.* 2C:4–8 and 2C:4–9 and *R.* 4:74–7," the last-cited being our civil commitment rule. *R.* 3:19–2 (as amended 1979).

Except for various amendments referred to hereafter, the situation remained unchanged until 1987 when the Legislature substantially revamped the statute concerning civil commitments. Of critical importance is the fact that no changes whatsoever were then or thereafter made either in our criminal statute concerning NGI committees or in the comparable criminal rule. That legislative change, in 1987, designed primarily to reflect clinical and programmatic advances and to incorporate language based on recent court decisions and rules, included, for the first time, a statutory provision concerning *in camera* proceedings. It required, in civil commitments, whether initial, final, or periodic, *in camera* proceedings, without any qualification or exception, for good cause or otherwise. In conformance with that statute, we amended our civil commitment rule, *Rule* 4:74–7 and included therein all of the appropriate changes necessitated by the new legislation, including an amendment of the *in camera* rule provision so that it became absolute, unqualified as it had previously been by the clause "unless good cause to the contrary is shown." We did not, however, amend our criminal rule concerning NGI committees nor did the Legislature amend the comparable NGI statute. The fact is, however, that our court rule concerning NGI committees continued to provide that they be treated not only in accordance with

*N.J.S.A.* 2C:4–8 and –9, which had no provisions concerning *in camera* hearings, but also continued to provide that they be treated in accordance with *Rule* 4:74–7, which now had this absolute *in camera* requirement; furthermore, the criminal statutes themselves, in providing generally that NGI committees after initial commitment thereafter be "treated as a person civilly committed," inferentially also now appeared to require, as a result of the amendment of the civil commitment statute, that all hearings concerning NGI committees be held *in camera,* absolutely.

The question, therefore, is whether the Legislature in passing this new civil commitment law in 1987 intended this requirement, without qualification, of an *in camera* hearing to extend to NGI committees' hearings as a result of the reference in the earlier criminal statutes that an NGI be "treated as a person civilly committed," which reference was passed at a time when the right to an *in camera* hearing was qualified by the good cause exception. There is no legislative history concerning the *in camera* provision of the new statute of 1987, none, in particular, concerning the omission of the good cause exception.

## III.

We note that no claim is here made that the constitutionally mandated equality of treatment between NGI committees and civil committees requires *in camera* hearings for both. Such a claim would be without merit. The equality mandated here by equal protection requirements has as its basis the premise that there is no fundamental difference for confinement purposes between NGI and civil committees. NGI committees are, in the eyes of the law, equally innocent, equally sick, and not necessarily any more dangerous. There are, however, at least three qualifications to this judicial mandate of equal treatment. First, what is required is not absolute equality, but "substantial equality." In *State v. Krol, supra,* 68 *N.J.* at 250–51, 344 *A.*2d 289, we stated:

the fact that the person to be committed has previously engaged in criminal acts is not a constitutionally acceptable basis for imposing upon him a *substantially* different standard or procedure for involuntary commitment. (Emphasis supplied.)

In *State v. Fields, supra,* we stated:

In light of the constitutional imperative of *substantially equal* treatment reflected in [*Baxstrom v. Herold,* 383 *U.S.* 107, 86 *S.Ct.* 760, 15 *L.Ed.*2d 620 (1966), and *Jackson v. Indiana,* 406 *U.S.* 715, 92 *S.Ct.* 1845, 32 *L.Ed.*2d 435 (1972)] we discern no constitutionally satisfactory justification for denying comparable protection to NGI committees.

. . . .

Justification for imposing restraints upon [the NGI committee's] liberty must be found under legal criteria which do not "deviate *substantially* from those applied to civil commitments generally."

[77 *N.J.* at 297, 390 *A.*2d 574 (quoting *State v. Krol,* 68 *N.J.* at 251, 344 *A.*2d 289 (emphasis supplied)).]

Second, the substantial equality that is mandated is based on the reasons for the constitutional mandate, namely, the protection of the committees' liberty interests, not other interests such as privacy and confidentiality. Third, to the extent that there are in fact differences between civil and NGI commitments, that will justify different treatment.[3]

No case has ever suggested any requirement of absolute equality of procedure or treatment in all respects. Indeed, the cases note that there *are* differences. For example, under *State v. Krol, supra,* 68 *N.J.* at 256, 344 *A.*2d 289, an NGI acquittee was *automatically* confined in a hospital for sixty days for observation and evaluation:

Proof by defendant that his criminal conduct was the result of mental illness provides sufficient justification for holding him in custody for a reasonable period of time to determine if he in fact should be indefinitely committed. Such procedures for automatic temporary commitment, even though deviating from

---

[3]*See State v. Krol, supra,* 68 *N.J.* at 253, 344 *A.*2d 289 ("Constitutional principles of equal protection, however, do not require that all persons be treated identically. They require only that any differences in treatment be justified by an appropriately strong state interest.").

procedures applicable to civil commitment generally, have uniformly been upheld.

[*Ibid.* (citations omitted).]

There was no such automatic confinement of a civil committee. And while *Krol* established that the State must show, at the initial commitment hearing, that the NGI defendant, just like a civil committee, was likely to pose a danger to himself or to society, the Court ruled at the same time that the burden of proof was only a preponderance of the evidence, noting the contrary trend in civil commitments requiring a greater burden of proof.[4] *Id.* at 257, 344 *A.*2d 289. In *State v. Fields, supra,* 77 *N.J.* at 299–300, 390 *A.*2d 574, the Court, while holding that NGI committees, like civil committees, are entitled to periodic review hearings, again ruled that the burden of justifying continued restraints was by a preponderance of the evidence. The Court further strongly emphasized that although NGI acquittees are entitled to such automatic periodic reviews, the court, in deciding whether to order release, must not disregard the difference between civil and NGI committees based on the latters' previous criminal conduct.

All of the qualifications mentioned above to the constitutional mandate of equality apply here. The conclusion is that there is no constitutional violation—that even where the law gives civil committees an absolute right to an *in camera* hearing, it need not give it to NGI committees.

We note, in this connection, the dispute over the constitutionality of the difference in burden of proof applicable in these

---

[4]*In re A.L.U.,* 192 *N.J.Super.* 480, 483, 471 *A.*2d 63 (App.Div.). *certif. den.,* 97 *N.J.* 589, 483 *A.*2d 131 (1984), perceptively notes that while *Krol* imposed only a preponderance burden for initial commitment, that lower standard would more likely benefit the committee thereafter since, under *Krol,* he or she had the burden of proof when seeking release. That burden is now on the State; *N.J.S.A.* 2C:4–8b(3).

The burden in civil commitments, by virtue of the 1987 statute, is now "clear and convincing evidence." *N.J.S.A.* 30:4–27.16, referring to *N.J.S.A.* 30:4–27.15.

proceedings, a clear and convincing standard constitutionally required for civil committees, *Addington v. Texas*, 441 *U.S.* 418, 99 *S.Ct.* 1804, 60 *L.Ed.*2d 323 (1979), preponderance of the evidence—at least in New Jersey—for NGI committees. The constitutionality of that less demanding standard, rejected by *In re Scelfo*, 170 *N.J.Super.* 394, 406 *A.*2d 973 (App.Div.1979), was reaffirmed by legislative amendment of *N.J.S.A.* 2C:4–8 and thereafter upheld by *In re A.L.U.*, 192 *N.J.Super.* 480, 471 *A.*2d 63 (App.Div.), *certif. den.*, 97 *N.J.* 589, 483 *A.*2d 131 (1984).[5] This instance of difference—concerning burden of proof—constitutionally justified, is obviously of a much more significant nature, relating, as it does, to the committee's liberty interest, than the difference with which we are concerned in this case.

Although these constitutional cases are not of direct applicability here, no constitutional question being raised, they do form the backdrop to our later discussion, since they are very much concerned, as we are here, with the differences between NGI and civil commitments and committees.

## IV.

■ We hold that the statutes governing the disposition of NGI defendants, *N.J.S.A.* 2C:4–8 and –9, should not be construed to incorporate the absolute requirement of *in camera* hearings found in the new law enacted in 1987, *N.J.S.A.* 30:4–27.1 to –27.23. More precisely, we hold that when the Legislature adopted the new law concerning civil commitments, it did not intend the absolute *in camera* requirement to apply to NGI commitments.

---

[5]We note, however, that *Jones v. United States*, 463 *U.S.* 354, 103 *S.Ct.* 3043, 77 *L.Ed.*2d 694 (1983), relied on in *In re A.L.U.*, clearly limits its holding that this difference in burdens of proof is constitutional to the *initial* commitment decision and not to periodic review hearings, which question it leaves open.

The question of statutory interpretation when one statute, *i.e., N.J.S.A.* 2C:4–8 and –9, incorporates all or part of another statute by reference, can be a difficult one.[6]

The general rule is that when a statute incorporates another by specifically referring to it by title or section number, only the precise terms of the incorporated statute as it then exists become part of the incorporating statute; absent language to the contrary, subsequent amendments to the incorporated statute have no effect on the incorporating statute. Indeed, even repeal of the incorporated statute does not ordinarily affect the incorporating statute. The latter remains in force just as it would if the referenced words had been written directly into it. On the other hand, if a statute, instead of incorporating the terms of another statute, incorporates a general body of law, the rule is that subsequent changes in that body of law do become part of the incorporating statute. N.

---

[6]We note here that Article IV, § VII, paragraph 5 of the State Constitution deals with this matter. The section provides that, "No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of the act or which shall enact that any existing law, or any part thereof, shall be applicable, except by inserting in such act." This provision has been interpreted to forbid the incorporation by reference of a substantive right or duty but not of a procedural or enforcement mechanism. *See Port of New York Auth. v. Heming,* 34 *N.J.* 144, 153, 167 *A.2d* 609 *cert. denied, appeal dismissed,* 367 *U.S.* 487, 81 *S.Ct.* 1676, 6 *L.Ed.2d* 1241 (1961) [and cases cited therein]; *State v. Cruz,* 76 *N.J.Super.* 325, 328, 184 *A.2d* 528 (App.Div.1962). Alternately, the provision has been read to forbid legislation not "complete in itself," but to permit incorporation of "auxiliary laws on the subject." *State v. Cruz, supra,* 76 *N.J.Super.* at 328, 184 *A.2d* 528 (quoting *Eggers v. Kenny,* 15 *N.J.* 107, 124, 104 *A.2d* 10 (1954)); *see State in Interest of L.M.,* 229 *N.J.Super.* 88, 101–102, 550 *A.2d* 1252 (App.Div.1988). We do not address the constitutional issue here because the parties did not raise it, and because a decision either way would not change our conclusion, *i.e.,* if the constitutional provision invalidates the incorporation, our conclusion is unaffected since we hold there is no incorporation intended insofar as an absolute requirement of *in camera* hearings for NGI committees is concerned; if, on the other hand, the constitutional prohibition does not apply, our conclusion is unaffected, having been reached without regard to it.

Singer, 2A *Sutherland Statutory Construction*, § 51.07; 51.08 (Sands 4th ed. 1984 & Supp.1989) (hereinafter *Sutherland*).

Although cases citing this rule, or canon of statutory construction, go back more than a hundred years, they say little or nothing about its rationale.[7] Nevertheless, the reason for the rule is easily surmised. Thus, where a statute refers specifically to another statute by title or section number, there is no reason to think its drafters meant to incorporate more than the provision specifically referred to. Nor is there any reason to think repeal of the incorporated statute indicates any intention to negate the incorporating statute, which may bear on an entirely different subject. Reference to a general body of law implies more, however, if only because there are likely to be facets of that law beyond those immediately occupying the Legislature's attention. Incorporating that general body of law then implies a judgment that the overall policies governing the incorporated law should likewise govern the statute incorporating it. On this assumption, it makes sense to incorporate new developments in that body of law into the incorporating statute as well.

The case law supports this understanding. Courts citing the rule have often modified it to conform to legislative intent. Thus, where "[t]he surface specificity of the incorporating language dissolve[d] upon close judicial scrutiny," *Director, Office of Workers' Compensation v. Peabody Coal Co.*, 554 F.2d 310, 324 (7th Cir.1977), courts have treated the specific

---

[7]The rule regarding the interpretation of specific references, which at one time was the rule regarding all incorporations by reference, derives from the English common law. In 1838, Mr. Justice Thompson explained it on the grounds that "no other rule would furnish any certainty as to what was the law, and would be adopting prospectively all changes that might be made in the law." *Kendall v. United States*, 12 Pet. (U.S.) 524, 625, 37 *U.S.* 524, 9 *L.Ed.* 1181 (1838), *quoted in* Read, *Is Referential Legislation Worthwhile*, 25 *Minn.L. Rev.* 261, 270. The rule regarding the interpretation of general references apparently orginated in an 1859 Florida case, *Jones v. Dexter*, 8 *Fla.* 276. See discussion in Read, *supra*, at 272–73.

reference as a general one.[8]

At first glance, the case at bar seems to present the opposite problem.[9] The criminal law regarding NGIs refers, on its face,

[8]*See U.S. v. Rodriguez–Rodriguez,* 863 F.2d 830 (11th Cir.1989) (despite specific references in 1980 drug possession statute to penalty provisions enacted in 1970, fact that possession statute was recodified in 1986 as part of the same act in which the penalty statute was amended "evidence[d] a congressional intent to incorporate subsequent amendments of the penalty provisions ... [into] the enforcement 'scheme' of the possession statute"); *E.E.O.C. v. Chrysler Corp.,* 546 *F.Supp.* 54, 73–75 (E.D.Mich.1982) (where Congress clearly intended to incorporate general F.L.S.A. (Fair Labor Standards Act) enforcement scheme into ADEA (Age Discrimination in Employment Act), had reviewed similar enforcement provisions of ADEA in 1978 prior to amending the act, and had enacted only amendments enhancing the remedial scheme, reference of 1974 ADEA act to restrictive consent requirement was superseded by subsequent amendment to F.L.S.A. dropping this requirement); *George Williams College v. Village of Williams Bay,* 242 *Wis.* 311, 7 *N.W.*2d 891 (1943) (where words of statute governing village sewer assessments and incorporating references to statutes governing city sewers, and contents of an attached revisor's notes, indicated that it was the general law on sewer assessments that was incorporated, fact that the statutes were also referred to in terms of numbered sections was not sufficient to constitute an "adoption by reference" of only those sections).

[9]While construing a specific reference, in context, as a general one is a recognized exception to the rule, the same cannot be said of the contrary practice. *See* 2A *Sutherland, supra,* § 5108. Indeed, we are aware of only one case treating an apparently general reference as a specific one. *Palermo v. Stockton Theatres, Inc.,* 32 *Cal.*2d 53, 195 *P.*2d 1 (1948). Moreover, although there were other indications that the legislature that enacted the statute at issue in that case intended the reference to be a specific one, the court construed it so primarily to avoid constitutional delegation of powers problems. The statute incorporated the terms of existing federal treaties to regulate the right of aliens not eligible for citizenship to own or lease realty. It provided that:

> [Such aliens] may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state ... in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject and not otherwise.
> [California Alien Land Law, 1 Deering's G. Laws, Act 261 (1920), *as amended by* Act of June 20, 1923 (Stats.1923, p. 1201), *quoted in id.* at 4.]

It should be noted that while the "now existing" language may seem by its terms to preclude the incorporation of subsequent changes in the referenced treaties, the *Palermo* court did not find this language dispositive. Other courts interpreting such language have disagreed on its import. *Compare, e.g., Som-*

to the general law regarding civil committees. It requires that the NGI committee "be treated as a person civilly committed" (*N.J.S.A.* 2C:4–8b(3)), and that his case "shall be specifically reviewed as provided by the law governing civil commitments." *N.J.S.A.* 2C:4–9d. However, these provisions were inserted to conform to judicial rulings that mandated *substantially* equal, not identical, treatment of NGIs and civil committees. Moreover, the Legislature has repeatedly qualified this requirement of uniform treatment with provisions requiring differential treatment of these groups.

In these circumstances, classifying the reference as "specific" or "general" can only be misleading. The real and unavoidable task is to determine whether the Legislature intended this substantially equal treatment to include the same unqualified right to an *"in camera"* hearing. Here, given the policy considerations involved, we do not believe that the Legislature intended that an NGI committee, where the charge was murder, having obtained an acquittal through testimony in open court that he was insane and presumably most dangerous, at least at the time of the offense, could shortly thereafter be released and join society on the basis of closed proceedings that found that he was either sane or not dangerous. As noted in Section VI, *infra*, the legislative action by amendment, reversing the results of a constitutional decision (*In re Scelfo, supra*, 170

---

*ermeier v. District Director of Customs*, 448 F.2d 1243, 1244 (9th Cir.1971) (California statute permitting importation of alcoholic beverages for personal use only to the extent such beverages were "exempt from payment of duty in accordance with existing provisions of federal law" incorporated subsequent modifications in federal law; had the state legislature intended to grant a right of importation of up to one gallon, the amount permitted duty free at the time the statute was enacted, "it would have been simple to say so.") *with Easeby's Petition*, 326 *Pa.* 511, 192 *A.* 646 (1937) (where reference was to the manner "as is now provided by law in the construction of state highways," word "now" prevented incorporation of subsequent changes, although the adoption was by general reference). *See* Annotation, *Effect of modification or repeal of constitutional or statutory provision adopted by reference in another provision*, 168 *A.L.R.* 627, 634 (1947).

*N.J.Super.* 394, 406 *A.*2d 973 (App.Div.1979)) that did not accord with legislative intent, inserting provisions reaffirming the preponderance burden of proof for NGI committees and, by further amendment (*N.J.S.A.* 2C:29–5(a)) reversing another decision (*State v. Kyles,* 166 *N.J.Super.* 343, 399 *A.*2d 1027 (App.Div.1979)), providing that an NGI committee is guilty of an offense if he or she tries to escape, whereas a civil committee is not, is inconsistent with the intent to mandate closed hearings in NGI cases.[10]

Before dealing further with our basic determination that the Legislature, in 1987, did not intend to make the new *in camera* absolute requirement applicable to NGI committees, we note that that conclusion leaves the NGI *in camera* requirement where it was when the NGI statute was adopted in 1978. That statute, *N.J.S.A.* 2C:4–8, requiring that NGI committees be "treated as a person civilly committed," had the effect of incorporating the civil commitment *in camera* requirement of *that* time, namely, the requirement then found in our rule, *Rule* 4:74–7(e), providing in civil commitments for *in camera* hearings unless good cause to the contrary is shown.

As noted later, (Section VI at 148, 570 *A.*2d at 933), our conclusion concerning legislative intent is based on considerations that also lead to the conclusion that good cause presump-

---

[10]The Legislature in 1979 enacted amendments to *N.J.S.A.* 2C:29–5, the former *N.J.S.A.* 2A:104–1 to –14, dealing with escape. *L.*1979, *c.* 178, § 58A (codified as amended in *N.J.S.A.* 2C:29–5). The enactment included within the definition of "official detention" persons committed pursuant to Chapter 4 of Title 2C. *N.J.S.A.* 2C:29–5a. This new legislation effectively overruled *State v. Kyles,* 166 *N.J.Super.* 343, 347–50, 399 *A.*2d 1027 (App.Div.1979), which held that the pre–1979 Code escape provision (like those in Title 2A) did not include persons committed to psychiatric institutions after being found not guilty by reason of insanity. Thus, persons committed both as unfit to stand trial (*N.J.S.A.* 2C:4–6) and as not guilty by reason of insanity (*N.J.S.A.* 2C:4–8) were subjected to the penalties for escape if they absconded. This provision has been found constitutional, even though it causes NGI committees to be treated differently from others involuntarily committed. *State v. Moore,* 192 *N.J.Super.* 437, 471 *A.*2d 41 (App.Div.1983), *certif. den.,* 96 *N.J.* 271, 475 *A.*2d 573 (1984).

tively exists in *all* cases in which the NGI committee was acquitted of murder. That conclusion avoids the conflict that would otherwise exist were we to conclude, as a matter of "practice and procedure," that NGI periodic review hearings should be held in open court and further conclude that the statute unconditionally required *in camera* hearings. Such a conflict would raise the question of whether the nature of the periodic review hearings is indeed a matter of "practice and procedure" committed exclusively to this Court, allowing for legislative treatment only if considerations of comity apply. *See Knight v. Margate,* 86 *N.J.* 374, 431 *A.*2d 833 (1981). We believe that it is, but note further that this Court has determined, as a general matter, that comity *will* apply to such questions. *See R.* 1:2–1, providing that all judicial matters shall be conducted in open court "unless otherwise provided by rule or statute." *But see State v. Krol, supra,* 68 *N.J.* at 255, 344 *A.*2d 289, indicating that the Legislature should devise statutory commitment and release procedures in order to comply with standards of equal protection and procedural due process.

The effect of our revision of *Rule* 4:74–7 in 1988, incorporating the new statutory absolute right to an *in camera* hearing in civil commitments, is the same as the 1987 legislation itself. Quite obviously, this Court was simply tracking that legislation, the intent being to conform our rule concerning civil commitments to that which was intended by the Legislature. We certainly had no other purpose. Having now concluded that the Legislature did not intend that aspect of its new statute, the absolute *in camera* hearing requirement, to apply to NGI commitments, it follows that our own rule should be similarly construed.

■ We therefore conclude that both the present NGI statute, *N.J.S.A.* 2C:4–8 and –9, and our rule, *Rule* 3:19–2, intend that periodic review hearings of NGI committees shall be conducted *"in camera* unless good cause to the contrary is shown." We note that there are various unreported decisions,

prior to the new statute, dealing with NGI murder committees holding that good cause does not exist and that hearings must be *in camera*. We note further that the practice at the trial level has apparently been mixed, as witnessed by those unreported decisions and by newspaper articles, some trial courts, as in the·instant case, ruling that when it comes to murder, the commitment procedures should be open. We are not aware of any case dealing with this aspect of the new statute.

## V.

■ Our consideration of the interests involved has further persuaded us that when the periodic review involves an NGI murder committee, and our holding in this respect is limited to murder committees, good cause for hearings in open court presumptively exists. It is a strong presumption, the burden of persuasion switching to the committee. The reasons for this conclusion also form part of the basis for our conclusion that the Legislature did not intend to mandate an absolute *in camera* requirement in NGI hearings.

In effect, when it comes to murder, the rule is that periodic review hearings shall be *open* unless good cause to the contrary is shown.[11] The primary reason for this rule is the need to preserve public confidence in the criminal justice system. There is probably no determination that causes more concern and doubt in the minds of the public about the fair and sound operation of our criminal laws than a jury verdict of not guilty by reason of insanity in a murder case.[12] There are three closely related aspects to this concern. First, the public's general fear that the guilty may be freed through the insanity defense—and to some extent, disagreement among members of the public over the legitimacy of the defense even where there

---

[11]Our ruling applies only to hearings that might result in the release of the committee.

[12]Our holding is limited to murder under *N.J.S.A.* 2C:11–3.

is admitted insanity involved. Second, the public's suspicion that recovery will rapidly follow acquittal and that the defendant will be set free, proving, to some of the public, either that the law was fooled when the jury acquitted the defendant or that the judge was fooled when the committee convinced him or her that he or she was no longer insane and dangerous. And, third, the public is concerned for its safety.

Anyone moderately familiar with criminal trials and the public's reaction where juries acquit on murder charges by reason of defendant's insanity knows the strength of these concerns and the vulnerability of the justice system to extreme erosion of confidence. Sociological studies confirm this.[13] Most noteworthy of the conclusions of one such study is that 88.7% of those surveyed believed that the system of releasing committees allows dangerous people back onto the streets.

Obviously, the criminal justice system cannot be transformed into a carbon copy of public sentiment. There are many times when courts distress the public, especially in murder cases, and almost always when it is the rights of a defendant that are being vindicated. Just as obviously, however, public confidence in the administration of criminal justice is of towering importance, and when it can be legitimately accommodated, it should be. What is involved here is a procedural device, unquestionably of some importance to the committee, in conflict with one of the strongest areas of public concern and doubt. The resolu-

---

[13]One recent study of juror attitudes conducted in Delaware revealed that 89.2% believed that the insanity defense provided a loophole for deceptive but sane criminals to go free. Hans, *An Analysis of Public Attitudes Towards the Insanity Defense,* 24 *Crim.* 393, 396, 404 (1986). However, the same study revealed that of those defendants that use the NGI defense, only 14% are successful. *Id.* at 406.

The same study showed that only 25.1% of the people surveyed believed that committees were released only when they posed no threat to themselves or others. 88.7% believed that the system allows dangerous people back onto the streets. Hans, 6 *Crim.* at 403. Actual figures obtained in the Delaware study revealed that the average length of stay for a NGI committee was 23.2 months. *Id.* at 407.

tion of that conflict may not be automatic, there are other considerations involved, mentioned later, but the interest here in favor of open hearings is compelling.

In *State v. Williams*, 93 *N.J.* 39, 459 *A.*2d 641 (1983), we analyzed the strength of that interest in the context of criminal pretrial proceedings. We held that the right of the public and the press to attend such proceedings is protected by both the first amendment and our State Constitution. While the proceedings dealing with the commitment and potential release of those found not guilty of murder by reason of insanity may not be criminal, strictly speaking, the interest in open hearings, identified in *Williams*, is strikingly similar:

> Conducting pretrial criminal proceedings in an atmosphere of secrecy is offensive to the general public and undermines the public trust essential to an effective judicial system. Exclusion of the public compromises the appearance of fairness because "secret hearings—though they be scrupulously fair in reality—are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." In addition to kindling public misperception and eroding public confidence, closure of significant pretrial proceedings perpetuates general ignorance and cuts off public knowledge necessary to a full understanding of the criminal justice system.
>
> . . . .
>
> Since the adoption of our current Constitution in 1947, the rules governing New Jersey courts have endorsed a strong and consistent policy in favor of open judicial proceedings.
>
> [*Id.* at 54, 56, 459 *A.*2d 641 (citations omitted) (footnote omitted).]

Obviously, the importance of pretrial proceedings to the criminal justice system dwarfs the institutional significance of proceedings to determine whether one found not guilty of murder by reason of insanity should be freed or committed to an institution. It is no exaggeration, however, to suggest that the institutional damage of closed proceedings to determine that issue is potentially devastating, arguably more "offensive to the general public," and more threatening than any other closed proceeding to "the public trust essential to an effective judicial system." (*Id.* at 54, 459 *A.*2d 641).

Of further import is the manner in which this Court dealt with this issue in *State v. Krol* and *State v. Fields*. The underlying decision in both of those cases was that the NGI committee was entitled to the same commitment proceedings as the civil committee, in *Krol* entitled to a determination of dangerousness as a condition to initial confinement, and in *Fields* entitled to automatic periodic review hearings. But as the Court made abundantly clear, the administration of that procedure had to carefully distinguish between the two kinds of committees, the Court's treatment suggesting an almost dramatic difference between the two. The difference noted was the probability of future dangerousness, the court concluding that the most likely indicator of any committee's future dangerousness was the fact that he or she had previously been convicted of a violent crime. *State v. Krol, supra,* 68 *N.J.* at 260–61, 344 *A.*2d 289; *State v. Fields, supra,* 77 *N.J.* at 308–09, 390 *A.*2d 574. While holding that the civil and NGI committee must be afforded the same proceedings, the Court emphatically stressed that in fact they must be treated differently.

> We underscore another teaching of *Krol.* While the fact that NGI committees have committed an act which would be criminal but for their successful plea of insanity will not justify according them substantially different legal treatment from that accorded other committees, nevertheless a legally cognizable distinction between the two groups does exist. With respect to an NGI committee, his propensity, by reason of his mental illness, to engage in serious antisocial conduct has on at least one occasion crystallized into the commission of what otherwise would constitute a criminal offense. The focus of course must always be upon the actual conduct of the committee, not merely upon its characterization as a "criminal" or anti-social conduct. The potential dangerousness of most civil committees ordinarily remains predictive and hypothetical, and may not have been so cogently demonstrated. In justifying the automatic commitment of persons acquitted by reason of insanity, the New York Court of Appeals has observed:
>
>> An individual who has committed an act of violence, and has thus demonstrated his dangerousness, and who has successfully asserted an insanity defense, may quite properly be treated somewhat differently from other individuals who, although they may in fact be potentially equally dangerous as a result of mental problems, have not yet so vehemently demonstrated their dangerousness by violent antisocial behavior. [*People ex rel. Henig v. Commissioner of Mental Hygiene, supra,* 43 *N.Y.*2d 334, 401 *N.Y.S.*2d 462 at 465, 372 *N.E.*2d 304 at 307.]

> In addition to justifying temporary observational confinement of a prospective NGI committee, *see State v. Krol,* 68 *N.J.* at 256 [344 *A.*2d 289], the fact that he has actually engaged in dangerous conduct otherwise criminal should weigh heavily in the court's assessment of the need for the continued imposition of restraints upon his liberty. *See State v. Krol,* 68 *N.J.* at 261 and n. 12 [344 *A.*2d 289]. Although his commission of an offense is, like any other instance of demonstrated dangerous behavior, of only evidentiary significance in the judge's determination of his dangerousness, evidence pertaining to that offense is highly probative of the ultimate issue. This is so because the actual commission of an act which violates the rules governing conduct in the community is of a different order of magnitude than mere threats to engage in such conduct. It is also more telling than is the commission of antisocial acts of lesser gravity. In short, an NGI committee's prior commission of an act for which he has been relieved of criminal responsibility is powerful evidence of his potential dangerousness and should be weighed accordingly in making that legal judgment.
>
> [*State v. Fields, supra,* 77 *N.J.* at 308–09, 390 *A.*2d 574.]

In *Krol* we also noted the jury's concern (and, inferentially therefore, the public's concern) about the matter when we ruled that the jury would no longer be asked to render a special verdict, after having found defendant not guilty by reason of insanity, on whether that insanity continues. One reason was the unlikelihood of a fair conclusion from such a jury. We reasoned that no jury would be inclined to find that insanity did *not* continue, for no jury would be willing to acquit a murder defendant on grounds of insanity and thereafter let him or her go free. *State v. Krol, supra,* 68 *N.J.* at 264–65, 344 *A.*2d 289; *see also State v. Jasuilewicz,* 205 *N.J.Super.* 558, 501 *A.*2d 583 (App.Div.1985) (trial court obliged to conduct *voir dire* to determine bias against widely publicized recent NGI verdict), *certif. den.,* 103 *N.J.* 467, 511 *A.*2d 649 (1986).

This difference in procedure—*in camera* vs. open hearings—is in addition to other, even more important, legislative differences. The initial confinement of an NGI committee, at least immediately after verdict, is without benefit of any judicial determination and, shortly thereafter, results from an almost summary determination by the court pending hearing; it is not comparable to the formal proceedings required for the initial confinement of a civil committee. And as we noted earlier, the burden of proof in the two proceedings is different: clear and

convincing proof is required for civil commitment, only a pre-
ponderance for an NGI committee. This important difference
reflects the belief that the NGI's prior violent criminal behavior
bears a rational relationship to the probability of future danger-
ousness. The presence of the prosecutor—provided for in NGI
hearings (*N.J.S.A.* 2C:4–8)—is another telling difference, for it
bears on the interests that justify our decision that periodic
review hearings on NGI murder committees be open. Why is
the prosecutor there? He is there because the public has a
special interest in these committees. He is there to guard
against any potential danger to the public. His presence is a
clear indicator of the Legislature's recognition of the public's
concern as is the requirement that the hearings be held before
the judge who presided at the criminal trial. They are there to
bolster the public's confidence in these proceedings. And while
their presence would tend to engender such confidence even if
the proceedings were held *in camera*, the public cannot be
expected to be content with the simple statement that the
prosecutor and the judge were there, if the public cannot be
told anything else.

While the competing values sought to be served by *in cam-
era* proceedings are significant, they are far more attenuated
with NGI committees than they are with civil committees.
What is sought to be served is the committee's interest in
privacy and confidentiality, and, further, an interest in total
candor between the committee and his or her psychiatrists,
thought to be prejudiced potentially by the knowledge that
someone may have to testify in public about what is said in
private, and the ultimate interest in better treatment and a
resulting greater chance for rehabilitation. Out of the candor
that is thought to be fostered by such closed proceedings, more
truth is claimed to emerge and a greater likelihood of a sound
determination.

We note first of all that the requirement of *in camera*
proceedings does not necessarily exclude everyone but the
witnesses and the parties. All *"in camera"* means is that the

public is excluded. Even in civil commitments the *in camera* hearing contemplates the presence of the patient's next of kin, for while the statute does not give them the right to be present, it authorizes the court to allow them to be. *N.J.S.A.* 30:4–27.-13c.

In many of these cases the next of kin favor continued commitment, so that the psychiatrists know that when they testify in those proceedings, while they may not be before the public, they may be before someone who might be regarded as having interests different from those that the psychiatrist may think he or she is there to protect. *In camera* hearings, were they required for NGI periodic review, would therefore not necessarily exclude the patient's next of kin or the decedent's next of kin, and since the prosecutor will be there the question of what *further* damage is done to the patient-psychiatrist relationship by opening these hearings to the public becomes problematic. Furthermore, under the new civil commitment statute, the patient, the committee, has an almost absolute right to be present, *N.J.S.A.* 30:4–27.14b, ending the prior statutory and rule provisions that implied such presence might significantly jeopardize the candor of the psychiatrist. But if the civil right of the patient is strong enough to permit his or her presence despite whatever jeopardy it may cause to the psychiatric testimony and to subsequent treatment, the public's right is at least as compelling—when balanced against that same interest, already diluted by the presence of next of kin, relatives of the victim, and the patient himself or herself.

Most important of all, however, in assessing the damage that is feared from open hearings is a consideration of the proceedings that lead to the confinement in the first place. The NGI committee by definition just went through a public trial in which his most private thoughts, his mental condition, his most intimate behavior, everything and anything deemed private and confidential, including his interaction with psychologists and psychiatrists, was spread before the public as fully as the court would allow it to be on behalf of the then criminal defendant.

And since the rule we adopt today is applicable only to NGI murder committees, it is certain that the presentation was indeed thorough, for the defendant's life was at stake—or, if not, then a potential thirty-year term of imprisonment. That thoroughness would also have characterized the State's case on the issue. The result is that a substantial part of a murder trial was devoted to a public dissection of the defendant, his or her mental condition, his or her private life, his or her treatment, all of the things sought to be shielded from the public through *in camera* periodic reviews. Without doubt, the NGI committee's personal interest in privacy and in the values served thereby is identical to the civil committee's. Those interests sought to be protected, however, have already been significantly eroded by the nature of the trial that led to the NGI commitment. As for the initial hearing on confinement, the testimony would almost be a verbatim repetition since it follows so closely on the trial. But the same applies most likely to subsequent periodic reviews, at least to a great extent, for without question all of the basic material, the most important information, was brought out at the trial. That is not to say that developments subsequent to confinement are not important, nor to deny the possibility that the openness of the proceedings might conceivably affect the relationship between patient and psychiatrist and even affect the testimony. But that possibility and its significance are substantially diminished by the prior criminal trial; they are not of sufficient weight to overcome the important interests that favor open proceedings.

The openness of the criminal trial has other significance besides its relevance to the issues of privacy and confidentiality. That openness bears on and to some extent explains the intensity of the public's interest and concern. The public has already heard all of the testimony, the public understands what it was that led a jury to find defendant not guilty by reason of insanity. It is now that same public that is to be told that as a result of a secret hearing the defendant is no longer dangerous, no longer insane, or both, that he has recovered, that it is safe

to set him free in society. But they are not told why. It is asking too much of the public to have trust in a system of criminal justice that keeps them in the dark, that refuses to tell them why a convicted murderer—for, although it is a misperception, that is how he or she is viewed by many—should be set free. If they were given all the facts, it might still be difficult for them to understand, but without the facts it is impossible.

We believe that the professionalism of psychologists and psychiatrists is such that they will not withhold treatment or prejudice treatment because of this determination. Whether they agree with our conclusion or not, they will understand that we are performing our duty in the scheme of things and that it is their obligation to conform to our determination. The concern that the determination may not be as accurate because of the fear that psychiatric testimony will not be as full must be answered in the same way. Indeed, similar concerns about the effect of the patient's presence on the truth and candor of psychiatric and other testimony, previously reflected in both statute and rule allowing his or her exclusion for that reason—among others (*N.J.S.A.* 30:4–41 (repealed); *R.* 4:74–7(e) (1988)), have been rejected by the Legislature. *N.J.S.A.* 30:4–27.14(b) (giving patient absolute right to be present at hearing unless his or her conduct prevents its continuance). *See Pressler, Current N.J. Court Rules,* Comment *R.* 4:74–7(e) at 1132–33 (1990).

The concern that our determination will subject the NGI committee to unjustified societal abuse when he is released seems totally beside the point, for whether he is released after *in camera* or open proceedings, surely the public will be advised of the fact. That is to say, there is nothing in the requirement of *in camera* proceedings that suggests the *determination* is to be anything other than public. He may, indeed, be subject to even more abuse if the public does not understand why he was released.

As for the concern that judges will be intimidated—if there is any such concern—it seems to us that ultimately we must have faith in the courage of judges, a faith that has been justified so many times under so many difficult circumstances as to be beyond question. But if a judge were of a mind to waver, how much more difficult it is to be brave when the decision you render will be for reasons that no one knows as compared to a decision that you have the opportunity to explain.

■ We therefore conclude that periodic review hearings for NGI murder committees shall be open to the public unless good cause to the contrary is shown. Good cause can be demonstrated by an evaluation of the factors that lead to our conclusion, determining whether those factors have so changed as to warrant *in camera* proceedings.[14] These factors include, to some extent, consideration of whether there has been significant new psychiatric treatment, significant new considerations of privacy and confidentiality, and, in general, significant testimony, whether relating to new developments or to the past, about the overall damage that would be done to the committee if the proceedings were open. But most of all good cause will require a showing that *in camera* proceedings will not adversely affect public confidence in the criminal justice system. That conclusion can result from a combination of many factors, including in most cases the lapse of time. We do not mean, through the strength of the presumption, to foreclose *in camera* hearings. But in some cases, no period of time will ever erase the public's concern.

We understand that an inevitable consequence of this opinion is that some NGI acquittees may never have an *in camera* hearing. To some extent, the reaction of the press to these matters will be a determinative factor, or at least a most

---

[14]In some cases, there may be good cause to have some portion of the proceeding *in camera,* even though the hearing is otherwise open under our ruling.

significant one. Such considerations may suggest to some that public opinion is influencing the course of judicial proceedings. We must respond that this is a correct observation. All of these things are both indicators and causes of the public's concern about the legitimacy of the criminal justice system and its operation; all of them go to the question of the vulnerability of public confidence in our system of criminal justice. All of them go to the heart of this most important interest, namely, maintaining public confidence. One of the most important obligations of government, and in particular of the judiciary, is to legitimately preserve public confidence. Under these circumstances we believe the public is entitled to know why someone deemed to have murdered another, not punished because of insanity but thereafter committed, is now going to be set free. The only way it will ever know is if the proceedings are open to the public.

We realize the ultimate consequence of our holding to the NGI murder committee. As innocent under our law as one who never committed any crime, as free of guilt as all who are mentally ill, as afflicted with the pain of such illness, as needing and deserving of help as all others, the NGI murder committee is, by our ruling, treated differently, in a sense protected less. The hearing open to the public seems almost a denial of his acquittal, a detriment to one found by law not guilty and, by the ethics that shaped that law, a detriment to one who is sick only and not evil. There are others involved however, other needs, other interests, and they are compelling. Society's concerns here are strong and equally legitimate. The interests conflict, and a choice must be made.

## VI.

Practically all of the factors that have, on balance, persuaded us to presumptively require open hearings for NGI murder committees bear strongly on our determination of legislative intent. We have initially identified and analyzed those factors

primarily as they relate to the question of the nature of the hearings—open or closed—since they are factors traditionally dealt with in considering questions of practice and procedure: whether open proceedings will prejudice the search for truth; whether such proceedings will interfere with the committees' relationship with psychiatrists; whether, given the general requirement of substantial equality, this procedural difference is comparable to other apparently permissible procedural differences; whether the presence of the prosecutor, the committee's relatives, the decedent's next of kin, and the committee himself diminishes the alleged value of closed proceedings; whether the trial leading to the NGI acquittal further substantially diminishes the value of closed proceedings, and the like. To the extent that all of these considerations, including the public's interest, are persuasive in favor of open hearings, they suggest the Legislature would not have intended to prohibit them. While these factors may be thought to be found more in the court's province than in the Legislature's intent, the overwhelmingly predominant factor favoring open hearings—preserving public confidence in our criminal justice system—is clearly the Legislature's concern as much as ours. In particular, we believe the Legislature fully shares our view that closed hearings leading to the release of an NGI murder committee would seriously erode the public's confidence; we do not believe the Legislature could have intended to mandate such an outcome.

We previously noted some of the important differences between the statutory proceedings for civil and NGI committees, compelling the obvious conclusion that the Legislature did not intend those proceedings to be identical, and thereby supporting our conclusion that it therefore did not necessarily intend identical mandated closed hearings. The differences are of even greater significance, however, for they reflect the Legislature's overriding determination to protect the public from the potential dangerousness of NGI committees and thereby its intent to preserve the public's confidence in NGI commitment

proceedings and in the institution responsible for those commitments—the criminal justice system. The first difference—the right of the prosecutor to appear and be heard—resulted from an amendment presumably aimed at the exclusion of a prosecutor from a hearing, an amendment clearly designed to protect against unwarranted NGI release by assuring the presence of the advocate of criminal law enforcement. The next difference, again by way of a specific amendment to reverse the effect of a judicial determination, eased the State's evidentiary burden in continuing the NGI's commitment, clearly designed to provide a greater likelihood of continued NGI confinement, again protecting the public from unwarranted NGI release. The last difference, once more by way of amendment overriding the result of a judicial determination, made that which was no offense if done by a civil committee a crime if the actor was an NGI committee—escape, the clearest potential threat to the public. It is almost inconceivable that the Legislature, so consistently concerned with protecting the public from potential NGI committees' dangerousness, so aggressively alert in its amendments of the statute, alert to correct any perceived weakening of that protection, would mandate a procedure truly disturbing to the public, unequalled in its potentially destructive effect on public confidence in the system, a mandated closed hearing that can free an NGI murder committee. Given this record of legislative action and concern, it would be unthinkable to construe a statute dealing solely with civil commitments as automatically mandating such an untoward procedure for NGI committees because of general rules of statutory construction that—in this setting—are wholly unrelated to legislative intent. Indeed, we would be reluctant to conclude that the Legislature mandated closed hearings for the release of NGI murder committees unless the Legislature said so, clearly and explicitly.

Given that legislative intent, given that history of the statutes and rules concerning NGI committees, we conclude that the 1987 statute was not intended to have the effect of mandating closed hearings for NGI committees; that such hearings

are governed by the civil commitment procedure that existed in 1979 when the NGI statute incorporated the then-existing civil commitment laws; that such procedure included the requirement of periodic hearings "*in camera* unless good cause to the contrary is shown"; and that, concerning NGI murder committees, good cause presumptively exists, the presumption being so strong as to transfer the burden to the committee to persuade the court, for good cause, that the hearing should *not* be open.

As noted above, we do not intend this strong presumption to have the effect of foreclosing *in camera* proceedings or of creating an almost insuperable obstacle against them. Trial courts retain the power, for good cause, to order that any periodic hearing, or part of it, be held *in camera*. That decision calls for a sensitive weighing of all of the factors mentioned throughout this opinion, including the committee's continuing interest in privacy and confidentiality. The public interest in open proceedings in these matters remains paramount, of course, but depending on the circumstances, it can be overcome.

## VII.

With but few exceptions, our concurring colleague appears to agree with our views. As he notes, most of his concerns are adequately addressed. For instance, while advancing a position that would permit part of the hearing to be *in camera* and part public, *post* at 156, 570 *A*.2d at 936–937 (Handler, J., concurring), he later notes, correctly, that we had explicitly so provided. See *post* at 161, 570 *A*.2d at 939 (Handler, J., concurring) (referring to *supra* at 147 n. 14, 570 *A*.2d at 932 n. 14). His concern that our decision forever strips the mantle of privacy from the NGI murder committee, *post* at 158–159, 570 *A*.2d at 938 (Handler, J., concurring), is similarly accompanied by an acknowledgment that our opinion explicitly recognizes that "the NGI committee's personal interest in privacy and in the values served thereby is identical to the civil committee's," *supra* at

143, 570 *A*.2d at 930, the obvious and basic issue here being the extent to which that interest must yield to other interests favoring open hearings. We have attempted to strike the proper balance; we have allowed, depending on the circumstances, for closed hearings; we most definitely have not precluded consideration of the NGI's privacy interests. See *supra* at 147, 570 *A*.2d at 932. The concurrence, furthermore, adjures the trial court to balance the interests involved, *post* at 161, 570 *A*.2d at 939. That is precisely what our opinion requires, *supra* at 147, 570 *A*.2d at 932. The concurrence goes on to emphasize that at each successive hearing the question of whether it should be open or closed should be considered separately, *post* at 161, 570 *A*.2d at 939 (Handler, J., concurring)—yet again that is quite clearly provided for in our opinion, *supra* at 147, 570 *A*.2d at 932. There are, however, some differences of substance between us which should be dealt with.

The concurring opinion suggests that closed proceedings are more likely to result in the truth, *post* at 161–162, 570 *A*.2d at 939 (Handler, J., concurring)—they "may be more conducive to the soundness and validity of [the] ultimate determination." *Post* at 160, 570 *A*.2d at 939 (Handler, J., concurring). While we acknowledge that open hearings may be embarrassing, discomforting, and impact on real interests—the committee's privacy interests—we do not agree that the soundness of the ultimate determination, the search for truth, is jeopardized by open hearings. As noted in our opinion, we do not believe that psychiatrists or others are more likely to tell the truth if the proceedings are closed. See *supra* at 145–146, 570 *A*.2d at 931–932. The notion that the truth will emerge best when the doors are closed is obviously totally contrary to our settled practices and beliefs. Absent *other* interests, the search for truth occurs in open court no matter how embarrassing it may be. Similar concerns for the integrity of the fact-finding process had previously led to the exclusion of the committee from the proceedings but, as we noted above, *supra* at 146, 570 *A*.2d at 932, the Legislature rejected that concern, giving the com-

mittee the absolute right to attend. Certainly none of the cases cited in the concurrence suggests in the slightest that *in camera* proceedings in any respect enhance the search for the truth, *In re Baby M*, 109 *N.J.* 396, 537 *A.*2d 1227 (1988); *N.J. Parole Bd. v. Byrne*, 93 *N.J.* 192, 460 *A.*2d 103 (1983); *In re Trantino Parole Application*, 89 *N.J.* 347, 446 *A.*2d 104 (1982); *State v. Boiardo*, 83 *N.J.* 350, 416 *A.*2d 793 (1980); *In re Maraziti*, 233 *N.J.Super.* 488, 559 *A.*2d 447 (App.Div.1989). To the minimal extent to which they deal with the open-closed issue, they do so in terms of evaluating impacts on privacy, confidentiality, and other interests—not at all the search for truth. Nor do the statutes cited by the concurrence support the proposition (*N.J.S.A.* 2A:84A–32.4(a) (child abuse—televised examination "[i]n order to spare a youthful witness the ordeal of repeatedly discussing the details of sexual assault or abuse," Senate Judiciary Committee Statement); *N.J.S.A.* 2A:84A–32.1 (*in camera* hearings clearly for the purpose of protecting privacy); *N.J.S.A.* 9:3–47 (adoption—again to protect privacy)).

The concurrence strongly objects to the observation that, by virtue of the preceding murder trial, the NGI's privacy interests have already been significantly eroded. *Post* at 157–158, 570 *A.*2d at 937–938 (Handler, J., concurring). Our observation is intended to reflect only that undeniable fact. Its relevance is not, as the concurrence suggests, to forever thereafter strip the NGI of the privacy that has already been substantially shredded but rather to note that initially, the privacy interest has been materially affected. As with other factors involved, we have weighed that fact in the balance in reaching our conclusion that periodic hearings should presumptively be open; it is a factor that also must be considered, with each NGI murder committee, whenever application is made to hold any release hearing *in camera*. The court's determination must consider that factor, along with others. It would be absurd, for example, to close an initial release hearing on privacy grounds if the evidence were to parrot that recently publicly exposed.

Finally, we strongly disagree with the suggestion that the court should decide, even tentatively, ahead of time, without hearing any of the evidence, whether the proceeding is likely to result in release or continued confinement and determine the open-closed issue on the basis of such tentative decision. See *post* at 162, 570 *A*.2d at 939–940 (Handler, J., concurring). The concurrence recommends that the court, if it believes continued confinement will be the likely outcome, should hold the hearing *in camera* ; if release is likely, it should hold it in public. The prejudice involved is obvious and substantial. Having decided on its own to close the hearing because release is unlikely, the trial court will inevitably feel some compulsion to deny release. Even worse than this prejudice suffered by the NGI committee—and we believe that is the main risk of this procedure—is the damage done to the public's interest, the public's right to observe these proceedings, and the consequent damage to the public's confidence in the judiciary. That damage occurs *whenever* NGI murder committee hearings are held *in camera,* no matter what the outcome. Certainly it is. worse when the *in camera* hearing is followed by release, but·it is very much involved even when confinement continues. Put differently, when an NGI murder committee has his hearing *in camera,* the damage is done. The difficult problem of determining when the factors that may favor an *in camera* hearing outweigh this damage cannot be solved or avoided by prejudging the case.

At the heart of the concurrence is the concern that our ruling makes open hearings "virtually mandatory," *post* at 155, 570 *A*.2d at 936 (Handler, J., concurring). But, as we state in the opinion, "we do not mean, through the strength of the presumption, to foreclose *in camera* hearings." *Supra* at 147, 570 *A*.2d at 932. The presumption in favor of open hearings *is* strong, strong enough to shift the burden to the NGI committee to prove good cause for *in camera* hearings. We note the factors to be weighed—mentioned throughout the opinion—in ruling on an application for an *in camera* hearing. Ultimately whether the proceedings are open or closed will depend on a

careful consideration of all of the varied circumstances, including the critical importance of the public's interest in these matters. Given the importance of that interest, and its critical role in our decision, the concurring opinion, despite its asserted agreement with us, sends a conflicting message through its repeated reassurances to the trial bench that it may shut out the public. If comment to trial courts is needed, we suggest that it be a simple reminder that the basis for open hearings in these cases is fundamental and strong, that potentially at stake is not only the public's interest in open hearings but the public's confidence in the judiciary.

## VIII.

Although the trial court held that the periodic review proceeding must be open to the public, it did so without consideration of the rule set forth in this opinion and the factors that bear on the application of that rule. Nevertheless, based upon the record, we find no reason to believe that the strong presumption in favor of open hearings in NGI murder cases can be overcome in this case now. We therefore affirm the judgment of the trial court and remand the matter for a periodic review hearing in open court, without prejudice, however, to any application on behalf of Edward S., to be determined in conformance with this opinion.

HANDLER, J., concurring.

The Court today holds that our current statutory scheme requires open public proceedings to determine whether an NGI-committee should be released. The extremely strong presumption that these hearings not be held *in camera* makes the Court's requirement of openness virtually mandatory. *Ante* at 138, 570 *A*.2d at 927.

I agree with the Court that these important and sensitive hearings should, in general, be open to the public. However, I write separately to stress that the presumption against the closure of NGI-release proceedings is not insuperable. Impor-

tantly, the Court does not deprive hearing judges of sensible and necessary discretion to evaluate the need for the closure of these release hearings. The Court's holding should not be understood to prevent or even discourage a hearing judge from engaging in careful deliberation in weighing the need for public access against legitimate reasons for closure. Moreover, even in circumstances that guide the court to open the hearing, the Court's holding does not mandate that *every* successive periodic release hearing for an individual NGI-committee be public. The Court anticipates that the closure determination should be made before each successive hearing. In addition, the Court's determination should not be construed to preclude judges from holding release hearings that are partially open to the public and partially conducted *in camera.*

Like the majority, I ground my conclusion that NGI release hearings should ordinarily be opened on the public's important and legitimate interest in both the conduct and outcome of such proceedings. Unlike the majority, however, I believe that the conceptual basis for the presumption in favor of opening such a review hearing to the public can be found in the reasons expressed by Justice Pashman in *State v. Fields*, 77 *N.J.* 282, 309, 390 *A.*2d 574 (1978), with respect to the central issue of such a hearing:

> [T]he fact that [the NGI committee] has actually engaged in dangerous conduct otherwise criminal should weigh heavily in the court's assessment of the need for the continued imposition of restraints upon his liberty.... [E]vidence pertaining to [the NGI's] offense is highly probative of the ultimate issue.... In short, an NGI committee's prior commission of an act for which he has been relieved of criminal responsibility is powerful evidence of his potential dangerousness and should be weighed accordingly in making that judgment.

These words seem both to define the ends of an NGI-release hearing and to explain the public's interest in having access to such a hearing. The public's evident interest in these hearings, however, is not the only factor to be considered.

We must also acknowledge that the Legislature has expressly dealt with this subject matter and has considered what procedures are appropriate. The Legislature has stated plainly

and explicitly that NGI-committee hearings "shall be specifically reviewed as provided by the law governing civil commitment." *N.J.S.A.* 2C:4–9(d). The predominant legislative view focuses on the similarities, not the dissimilarities, between the two types of committees. This Court has itself declared on two separate occasions that NGI and non-NGI committees must receive the same substantive and procedural protections. *Fields, supra,* 77 *N.J.* 282, 390 *A.*2d 574; *Krol, supra,* 68 *N.J.* 236, 344 *A.*2d 289. Underlying these opinions was a recognition that

> [c]ommitment following acquittal by reason of insanity is not intended to be punitive, for, although such a verdict implies a finding that defendant has committed the *actus reus,* it also constitutes a finding that he did so without a criminal state of mind. There is, in effect, no crime to punish. .
>
> [*Krol, supra,* 68 *N.J.* at 246, 344 *A.*2d 289.]

Thus, in terms of the considerations that should determine release, there are critical differences between NGI-committees and civil-committees. Nevertheless, these ought not result in a procedural chasm between the two. Our decision today must be read in light of our past recognition that, though not identical, NGI-committees are in substantially similar circumstances as civil committees. *See ante* at 128, 570 *A.*2d at 922. Today's holding, even though it moves the pendulum far in favor of open hearings, does not totally repudiate the values that animated *Rule* 4:74–7, governing civil commitment and review proceedings. The policy served by that Rule, including its presumption of *in camera* hearings "unless good cause to the contrary is shown," retains its vitality and cannot be ignored in addressing the need for public access to review hearings involving NGI committees as now perceived by the Court.

The majority grounds its holding in part on the public nature of the antecedent criminal trial. The Court reasons that because the trial itself was public, the NGI-committee has also suffered a loss of privacy and, therefore, has a diminished privacy interest that is deserving of less consideration and protection. The Court also reasons that the public's interest in

the proceeding has been whetted or heightened by the public trial and thus deserves or requires greater indulgence. There may be some truth in each proposition. I believe, however, that the Court exaggerates and distorts their significance and couches its holding in terms that may mislead lower courts and participants in these matters.

Certainly the public aspects of a criminal trial, which are constitutionally grounded, *see State v. Williams*, 93 *N.J.* 39, 459 *A.*2d 641 (1983), may serve to create and sustain a continuing public interest in the fate of the criminal defendant who has become an NGI-committee. I agree that this legitimate public interest strongly dictates the need for public access in subsequent proceedings, be they denominated civil or criminal, that may result in the return of such an individual into society. But in positing an equivalent need for public access, the Court, I believe, overstates the similarity between the NGI-release hearing and the criminal prosecution from which it originated. I differ from the Court when it reasons that, because of the public nature of the criminal trial, there is a continuing need for public access to subsequent institutional-release proceedings and that this need is so great that it overwhelms all other legitimate and appropriate concerns. I believe there are concerns that the Court does not stress having to do with the integrity of such hearings and the efficacy of the truth-determining procedures of such hearings, as well as with the privacy interests of the person whose liberty is at stake.

The majority's opinion is dominated by the fact that because the NGI committee comes to a mental institution *via* a criminal prosecution in which he or she was exposed to the public, his or her mantle of privacy has effectively been removed. I fail to see how one can conclude that because a person was once exposed to public scrutiny, the desire and need for privacy is no longer to be prized or preserved. The interests at stake in the underlying criminal trial are wholly different from those in the subsequent NGI hearings. At trial, the fundamental inquiry concerns the defendant's guilt or innocence. At NGI release

hearings, the committee has already been judged, quite literally, "not guilty by reason of insanity." [1] The committee's privacy interests, which the majority properly admits are "identical to the civil committee's," *ante* at 145, 570 *A.*2d at 931 are sharply drawn into issue at these hearings. I cannot subscribe to the view that individual privacy once lost is forever lost and cannot be retrieved, that personal dignity, though severely compromised, cannot be restored. I simply do not place significance on the majority's observation that those privacy interests "have already been significantly eroded by the nature of the trial that led to the NGI commitment." *Id.*

We have recognized in other kinds of proceedings, that, although the public has a legitimate interest in what happens to a person who has been subjected to criminal prosecution, other considerations can militate against open hearings or can dictate limitations of the extent of public access. *See, e.g., N.J. Parole Bd. v. Byrne,* 93 *N.J.* 192, 460 *A.*2d 103 (1983) (public access to parole hearing may be limited); *In re Trantino Parole Application,* 89 *N.J.* 347, 446 *A.*2d 104 (1982) (same). Even in criminal prosecutions, privacy interests can serve to limit public access. *See, e.g., N.J.S.A.* 2A:84A–32.1 (in rape prosecution, evidence of victim's prior sexual conduct admitted only after *in camera* hearing). The need to assure the discovery of the truth can also justify such restrictions. *See, e.g., N.J.S.A.* 2A:84A–32.4(a) (in child abuse or sexual assault cases, witness may testify on closed-circuit television, out of view of the jury, defendant, and spectators). Thus, while the public continues to have an extremely strong interest in the outcome of institutional-release hearings involving NGI's, that interest is not absolute

---

[1] The majority makes the observation: "It is asking too much of the public to have trust in a system of criminal justice that keeps them in the dark, that refuses to tell them why a *convicted murderer*—for that, although it is a misperception, is how he or she is viewed by many—should be set free." *Ante* at 146, 570 *A.*2d at 931 (emphasis added). It is troubling that the Court seemingly gives credence to this "misperception" to bolster the need for public access to these hearings.

and may be reasonably conditioned. Consistent with the public's interest and need to know, a court in a given case can and should be able to seek reasonable accommodations of that concern, *Byrne, supra*, 93 *N.J.* at 210–11, 460 *A.*2d 103. But it does not follow inexorably that such proceedings must necessarily be open to the public.

In addition to concerns for privacy as such, the Court must be mindful of the integrity of such hearings and the special problems involved in the search for the truth. Because of the intrinsic sensitivity, subjectivity and personal nature of such inquiries, and the quality of the testimony and evidence that must be brought to bear to illumine the issues, *in camera* proceedings may be more conducive to the soundness and validity of that ultimate determination. We have already acknowledged and understood these considerations with respect to civil commitment hearings, parole hearings, adoption hearings, termination of parental rights proceedings, preliminary hearings involving privileged information, and the like. *See, e.g., In re Baby M*, 109 *N.J.* 396, 537 *A.*2d 1227 (1988) (parental rights); *Byrne, supra* (parole); *State v. Boiardo*, 83 *N.J.* 350, 416 *A.*2d 793 (1980) (preliminary hearing involving privileged information); *In re Maraziti*, 233 *N.J.Super.* 488, 559 *A.*2d 447 (App.Div.1989) (sexual assault of minors); *N.J.S.A.* 9:3–47 (adoption); *Rule* 4:74–7 (civil commitment). *Cf. N.J.S.A.* 2A:84A–32.4(a) (in criminal trial involving child abuse, victim may testify out of courtroom before closed-circuit television). A court must be mindful of the countervailing effects of public access and publicity and appropriately balance such concern. *See Trantino, supra*, 89 *N.J.* at 376, 446 *A.*2d 104 ("it is undeniable that public outrage over an imminent parole determination ... has no place in a parole proceeding and is to be given no weight in a parole decision.").

These considerations do not overcome the notion that an NGI-committee release hearing should ordinarily be open to the public. But they counsel courts to carefully weigh cases on an individual basis and balance the personal invasiveness of the

ensuing inquiry with the correlative public interest in the outcome of the case and the public's need for access to the proceedings. Thus, as I view it, the reviewing court should have the discretion to preserve the integrity of the determinative process and to protect the committee's privacy interests by providing for *in camera* dispositions of limited aspects of the proceedings if it determines that the need to protect the committee's privacy interests, the need to develop sensitive evidence, and the need to preserve the integrity of the proceedings counsel against an open hearing. In addition, the court also has the authority to hold hearings that are only partially public. *See ante* at 147 n. 14, 570 *A.*2d at 932 n. 14. As the majority notes, the court could decide that in a given case only certain persons should have access to the hearing, such as the prosecutor, the committee's family, the victim's family or selected representatives of the press. *Ante* at 143–144, 570 *A.*2d at 930. Indeed, the prosecutor has the right to be present at all release hearings. *N.J.S.A.* 2C:4–8b(3). And as the majority admits, the presence of the prosecutor "guard[s] against any potential danger to the public." *Ante* at 143, 570 *A.*2d at 930.

Finally, it is important to consider each successive release hearing separately. As this Court has previously observed, "[t]he standard for determining the need for continued institutionalization is 'dangerousness to self or society.'" *Krol, supra,* 68 *N.J.* at 259, 344 *A.*2d 289. "The reviewing court must consider any improvement or deterioration in the committee's condition since the initial hearing, which serves to increase or decrease the danger he would pose to himself or the community under the current level of restraints." *Fields, supra,* 77 *N.J.* at 301, 390 *A.*2d 574. For the court to conclude that the committee must remain in custody, it must determine that there is "a substantial risk of dangerous conduct within the reasonable foreseeable future." *Krol, supra,* 68 *N.J.* at 259, 344 *A.*2d 289. Thus, is particularly unlikely that an NGI committee will be released at early review hearings. *See Fields, supra,* 77 *N.J.* at 303, 390 *A.*2d 574 ("even where the committee's condition

shows marked improvement, only the most extraordinary case would justify modification in any manner other than by a gradual de-escalation of the restraints upon the committee's liberty."). We have required that review hearings be held every six months, *R.* 4:74–7(g)(2), so long as an NGI committee remains hospitalized. To a greater extent than in other types of cases, a judge in successive NGI proceedings will generally have the opportunity to become closely acquainted with the intricacies and nuances of the NGI committee's record of treatment and behavior. If the judge anticipates that the committee will remain institutionalized, there may be a lesser need to open the hearing to the public because there is a smaller risk of the damage to the public's sense of justice, so fervently invoked by the Court. *See ante* at 148, 570 *A.*2d at 933. Conversely, a judge, thoroughly familiar with the case and the record, may be able to anticipate after a considerable period of institutionalization and treatment that a review hearing is likely to result in the committee's release; this may tilt the scale in favor of an open hearing.

I believe the concerns expressed herein are important and should be considered in understanding the standard imposed by the Court and should be factored into the discretion to be exercised by judges under that standard. It is with this perception of the Court's opinion that I express my concurrence with it.

HANDLER, J., concurring in result.

*For affirmance and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.