Jay ARTZ, Claimant,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Respondent.

No. CIV.A. 01–2004I(FEI).

United States District Court, D. New Jersey.

Aug. 14, 2002.

Community Health Law Project, Inc. by Brian G. Smith, Esquire, Collingswood, NJ, for Claimant.

Jo Anne B. Barnhart, Commissioner of Social Security by Anthony J. LaBruna, Assistant U.S. Attorney, Newark, NJ, for Defendant.

IRENAS, District Judge.

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination by the Commissioner of Social Security (the "Commissioner"). Claimant Jay Artz seeks judgment regarding the suspension of his monthly Disability Insurance Benefits from February, 1995 through April, 1996. For the reasons set forth below, this Court will affirm the Commissioner's decision.

## I. Facts and Procedural History

From February 1995 through April 1996, Jay Artz's ("Artz" or "Claimant") Disability Insurance Benefits were suspended pursuant to Section 202(x) of the Social Security Act, 42 U.S.C. § 402(x) as amended, which became effective on February 1, 1995. Under this section, Disability Insurance Benefits cannot be collected

when an individual "is confined by court order in an institution at public expense in connection with ... a verdict or finding that the individual is not guilty of such an offense by reason of insanity." 42 U.S.C. § 402(x)(1)(A)(ii).

Artz has been intermittently hospitalized for psychotic episodes since 1973 as a result of his paranoid schizophrenic condition. In 1973, Artz was at Eastern State Hospital diagnosed with an acute schizophrenic episode and was discharged on September 10, 1973. In November 1973, he attended day programs at Jefferson Hospital Psychiatric Unit. (R. at 121). In June 1976, he went to California with the idea of attacking President Nixon, but did not have specific plans. While hitchhiking, he was stopped by police, whom he assaulted. Artz was found psychotic and confined to California Mental Hospital. The State dropped the charges and Artz was brought to his father in Philadelphia. (*Id.*) From September 10–17, 1976, Artz was hospitalized at Albert Einstein Medical Center because of psychosis and suicidal ideations. (R. at 122). The following year, from October 21–31, 1977, Artz was hospitalized at Ancora Psychiatric Hospital for manic depressive illness. At this time, Artz had been drinking heavily, and was discharged to jail because of marijuana possession. (*Id.*)

Claimant was readmitted to Ancora from December 23, 1977, through March 29, 1978, at which time he was found to be abusive and violent. On June 22, 1978, Artz was seen at the Atlantic Mental Health Center where he was deemed to be nondelusional, but spoke with "some tangentiality and some mild pressure." (R. at 118). Artz returned to Ancora on January 21–22, 1981, where he was diagnosed with paranoid schizophrenia. (R. at 122). A subsequent evaluation at Atlantic Mental Health Center, on February 6, 1981, revealed that Artz had not been taking prolixin, his antipsychotic medication, thought there were listening devices present, and evidenced disorganized thinking, but did not display suicidal or homicidal ideations or act out.

Soon thereafter, on February 16, 1981, as a result of his condition, Artz murdered his mother. A March 20, 1981, evaluation reported that Artz's condition was extremely serious, and he evidenced a marked departure from reality. (R. at 118). Later that year, on December 28, 1981, Artz was involuntarily committed to Ancora State Hospital, pursuant to N.J.S.A. § 2C:4–8 (commitment of a person by reason of insanity), as a *Krol* patient,[1] after being found not guilty by rea-

---

1. Under *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975) and *State v. Fields,* 77 N.J. 282, 390 A.2d 574 (1978), persons acquitted of crimes by reason of insanity are afforded many of the same rights as those civilly committed. The New Jersey Supreme Court's decision in *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975), established many rules to govern the treatment and commitment of individuals acquitted of criminal charges by reason of insanity. Among other things, the *Krol* decision held that a judicial hearing was necessary to commit persons found not guilty by reason of insanity. Previously, an individual was automatically committed following a not guilty by reason of insanity verdict. The judicial hearings require the State to assume the burden, by a preponderance of the evidence, that the acquittee is presently mentally ill and likely poses a danger to himself or to society. Once the State meets this burden, the court must order "suitable restraints" to "protect the public and provide defendant with appropriate treatment." *Krol,* 344 A.2d at 300. The courts are to determine the restraints necessary to "reduce the risk of danger which [the individual] poses to an acceptable level." *Id.* at 303. Subsequent changes to the imposed restraints may be made if the moving party proves by a preponderance of the evidence that the level of dangerousness posed by the committee warrants a different level of restraints or none at all. *Id.* at 304, n. 13.

son of insanity for killing his mother. (R. at 131, 149). While imprisoned, Artz was reported to continue to have psychotic symptoms. (R. at 118).

On January 13, 1982, Artz filed an application for Disability Insurance Benefits, identifying December 31, 1980, as the onset date of his disability. (R. at 47–50). His claim was denied on June 9, 1982, because his condition was not deemed disabling. (R. at 54). Artz then filed a Request for Reconsideration for Disability Insurance Benefits, on August 4, 1982, because he was confined in Ancora and could not work. (R. at 56). His Request for Reconsideration was denied on September 7, 1982. (R. at 58).

Artz then filed a Request for Hearing on September 15, 1982. On January 18, 1983, Artz received a favorable decision from the Social Security Administration, notifying him that he was eligible for Disability Insurance Benefits, and that a hearing was unnecessary given the weight of the medical records. (R. at 136). The ALJ found that Artz had severe paranoid schizophrenia, requiring lengthy periods of hospitalization and intensive treatment, which prevented Artz from engaging in substantial gainful activity since December 31, 1980.

On June 6, 1989, Artz was conditionally released from Ancora with several provisions. Artz was required to appear for ongoing psychiatric care and administration of medication; submit to weekly psychotherapeutic, psychological or psychiatric counseling; take doses of prolixin as directed; abstain from substance abuse; follow additional medical instructions regarding the prescribing of other medications; submit to random urine monitoring; participate in vocational rehabilitation programs; and not to reside with his grandmother alone. (R. at 144–46). Artz was also required to attend annual mental status evaluations.[2] These periodic judicial reviews are mandated by *Krol* and *Fields* to ensure the adequacy of the ongoing treatment, and to ascertain the dangerousness level of the acquittee in relation to the existing restrictions. If an individual is found to be a danger to himself or others, the reviewing judge has the authority to order that he undergo a psychiatric evaluation, and if necessary, to recommit him to a state psychiatric facility.

Following his conditional release, Artz was hospitalized twice at Ancora from July 7–20, 1993, and February 23—March 30, 1994. (R. at 149). Following a *Krol* hearing, the Court determined that because Artz had discontinued his medication, he represented a danger to himself and others. Accordingly, on July 22, 1994, the Court issued an order involuntarily committing him to Ancora Hospital. (R. at 179).

While hospitalized, Artz received notification, dated March 22, 1995, that his Disability Insurance Benefits were to retroactively cease as of February 1, 1995. (R. at 138). Artz filed a Request for Reconsider-

---

In *State v. Fields*, 77 N.J. 282, 390 A.2d 574 (1978), the New Jersey Supreme Court held that like those civilly committed, individuals acquitted by reason of insanity are entitled to periodic judicial reviews to determine if continued commitment is justified and/or whether lesser restraints are appropriate, per N.J. Ct. R. 4:74-7 (Civil Commitment Adults). *Id.* at 582. At these periodic judicial reviews, the State must demonstrate by a preponderance of the evidence that the restrictions imposed are in accord with the criteria set forth in *Krol* for making an initial determination regarding the level of restraint to be imposed. N.J.S.A. § 2C:4-9 (release of persons committed by reason of insanity). *Id.* at 585–86.

2. Although the release order does not specifically indicate that Artz was subject to annual review, other documents speak to that effect. (R. at 52).

ation on July 31, 1995, (R. at 140), which was denied on January 27, 1997, based on §§ 202(x), 216(i) and 223 of the Social Security Act. (R. at 143). Artz appeared before an Administrative Law Judge ("ALJ") to appeal this decision, on March 18, 1998. (R. at 27). Artz's appeal was then denied on June 25, 1999. (R. at 40). At the time of the hearing, Artz had been out in the community for two years. (*Id.*) In applying the law to the facts of Artz's case, the ALJ held that there was no indication Congress intended any exception from the general policy of not permitting any individual acquitted by reason of insanity to collect Disability Insurance Benefits while institutionalized by court order at public expense. The ALJ determined that Claimant was re-confined by court order in an institution at public expense in connection with that verdict, commencing July 22, 1994, and ending April 10, 1996, and was thus, not entitled to Disability Insurance Benefits during that time. The ALJ found that Section 202(x) applies to re-confinements by court order in institutions at public expense regardless of the date of the original verdict that underlies the re-confinement. Furthermore, the ALJ found the fact that under the *Krol/Fields* line of cases, re-confinements of New Jersey residents by court order in institutions at public expense in connection with an original verdict of not guilty by reason of insanity are not considered "criminal confinements" but are considered "civil confinements," does not exempt the Claimant from operation of the new provisions of Section 202(x). (R. at 19–20). The ALJ opined that Artz would have to pursue a change on the legislative level to prevail on his claim. (R. at 18–20). Artz requested a review of the ALJ's finding by the Appeals Council, but this request was denied on February 23, 2001. Currently, Artz seeks judicial review of the ALJ's decision, seeking retroactive payment of the Disability Insurance Benefits which were suspended from February 1995 through April 1996.

## II. Standard of Review

Section 405(g) of Title 42 of the United States Code sets forth the standard of review to be utilized by this Court in reviewing a decision of the Commissioner of Social Security. Findings of fact by the Commissioner which are supported by "substantial evidence" are conclusive. 42 U.S.C. § 405(g). Substantial evidence has been defined as "more than a mere scintilla." It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir.1995); *Lewis v. Califano,* 616 F.2d 73 (3d Cir.1980). The administrative decision "should be accompanied by a clear and satisfactory explanation of the basis on which it rests." *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981). The administrative decision should indicate not only the evidence that supports the ALJ's conclusion, but also any "significant probative evidence" that was rejected as well as the reasons for its rejection. *Id.* at 705.

The Third Circuit has elaborated further on the proper standard of review, stating that "our decisions make clear that determination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Commissioner ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1973). In reaching a conclusion that a Claimant is

capable of performing work, the ALJ must analyze all evidence and explain the weight that the ALJ has given to probative exhibits. *Gober v. Matthews,* 574 F.2d 772, 776 (3d Cir.1978). Although deference is given to administrative decisions, it is the duty of this Court to scrutinize the entire record to determine whether the ALJ's findings are rational and supported by substantial evidence. *Id.*

### III. Analysis

The issue in this case centers on the interpretation and application of 42 U.S.C. § 402(x). This statute reads in pertinent part:

> (x)(1)(A) Notwithstanding any other provision of this title, no monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual—
>
> .     .     .     .     .
>
> (ii) is confined by court order in an institution at public expense in connection with—
>
> .     .     .     .     .
>
> (II) a verdict or finding that the individual is not guilty of such an offense by reason of insanity,
>
> .     .     .     .     .
>
> (B)(ii) For purposes of clause (ii) of subparagraph (A), an individual confined in an institution as described in such clause (ii) shall be treated as remaining so confined until
>
> (I) he or she is released from the care and supervision of such institution, and
>
> (II) such institution ceases to meet the individual's basic living needs.      .

42 U.S.C. § 402(x).

What specifically is at issue is how broadly the language "in connection with"

should be interpreted. Claimant urges this Court to adopt and apply a narrow interpretation of this language under which Artz's court-ordered recommitment would not be considered to have been "in connection with" his original verdict of not guilty by reason of insanity.

In 1994, Congress amended 42 U.S.C. § 402(x) to include those found not guilty by reason of insanity in the class of people who are to have their Social Security benefits suspended while institutionalized at public expense. The rationale for this change was expressed in a report issued by the Ways and Means Committee:

> In making these changes, the Committee is seeking to establish greater consistency in the policy that Congress enacted in 1980 banning Social Security benefit payments to incarcerated felons. That limitation recognizes that prisoners receive full support from public resources in the form of food, clothing, lodging, and basic health care. In the Committee's view, the same situation exists in the case of criminally insane individuals who are confined to institutions at public expense. The provision would:
>
> .     .     .     .
>
> Extend the limitation to criminally insane individuals who are confined to institutions by court order at public expense in connection with an offense punishable by imprisonment of more than one year.
>
> ... the court order must be issued in connection with a verdict of guilty but insane, a verdict of not guilty by reason of insanity, a finding of incompetence to stand trial, or a similar verdict or finding based on similar factors (such as mental disease, mental defect, or mental incompetence).

H. Rep. No. 103–491 at 7–8; 1994 U.S.C.C.A.N. 3266, 3273.

As the report further explains, this policy is consistent with the Social Security Act, which:

> is intended to replace earnings and provide basic income for food, clothing, and shelter to workers who retire or become disabled. Individuals who have been committed to an institution pursuant to committing a crime are already relying on public funds to cover the costs of their basic living expenses. It is particularly inequitable that, in some instances, criminally insane individuals so institutionalized receive higher benefits than their victims or their victims' survivors.

H. Rep. No. 103–491 at 3; 1994 U.S.C.C.A.N. 3266, 3268.

The report also differentiates between conditionally released and unconditionally released patients. As the report suggests, Congress intended that the "limitation on [the receipt of monthly Social Security benefits] would continue to apply until such time as the individual is *unconditionally released* from the care and supervision of the institution to which he or she was committed, so long as the institution continues to cover the cost of the individual's basic living needs." H. Rep. No. 103–491 at 8; 1994 U.S.C.C.A.N. 3266, 3273–74 (emphasis added). The distinction that the report draws between conditionally and unconditionally released individuals demonstrates that Congress did intend that there be a time where persons committed following being found not guilty by reason of insanity would be eligible to receive Social Security benefits while institutionalized. Once unconditionally released, the acquittee is to be treated as those persons civilly committed without a criminal verdict associated with them. However, the report also clearly suggests that prior to an unconditional release, all court-ordered commitments of persons previously acquitted on criminal charges by reason of insanity will be deemed to have been "in connection with" the original verdict or finding.

■ The statute thus clearly reflects Congress' intent to preserve public funds by preventing the "double-dipping" that occurs when individuals found not guilty by reason of insanity have their basic needs provided for at public expense while institutionalized, in addition to receiving monthly Social Security benefits which are intended to cover those same needs. Accordingly, as a general matter, the statute should be construed broadly to prevent the depletion of public funds at the hands of acquitees receiving double compensation for living expenses.

Moreover, none of the Claimant's arguments persuade the Court that it should adopt a narrow interpretation of the section. Claimant argues that although his 1994 commitment was related to his prior criminal case, it was not "in connection with" the verdict, as the statute requires. However, Artz was committed under the criteria set forth in *State v. Krol*, 68 N.J. 236, 344 A.2d 289 (1975). As a *Krol* patient, Claimant has acknowledged that he was obligated to attend periodic mental status reviews while institutionalized, and that, as a conditionally released patient, he remained subject to involuntary recommitment upon a judicial finding that he presents a danger to himself or others. (R. at 42–43).

Individuals who are acquitted on criminal charges by reason of insanity are hospitalized upon a finding that they remain a danger to themselves or others. The reason for hospitalizing these persons is to "protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." *State v. Krol*, 68 N.J. 236, 344 A.2d 289, 295 (1975).

■ When evaluating patients acquitted by reason of insanity, the principles of due process require that the "standard for commitment be cast in terms of continuing mental illness and dangerousness to self or others, not in terms of continuing insanity alone, and that some trier of fact make a meaningful determination as to whether defendant is actually within these standards." *Id.* at 296. After a conditional release, there is an ongoing concern, by the courts, to protect the committee and the public. The court reserves the ability to maintain control:

> [w]here the court has probable cause to believe that a non-institutionalized defendant poses an imminent danger to himself or others, whether because the original restraints have proven inadequate, because defendant has not complied with the terms of the order, or because defendant's condition has changed, it may order defendant temporarily institutionalized for further observation and evaluation pending proceedings for modification of the prior order.

*Id.* at 303–04.

Moreover, the Supreme Court of New Jersey further expressed their control over individuals found not guilty by reason of insanity who are conditionally released by supporting the notion expressed in *State v. Carter,* 64 N.J. 382, 316 A.2d 449 (1974) that:

> [t]he success of a conditional release depends, to a large extent, upon the adequacy of the supervisory controls imposed by the courts to insure the public safety. The most obvious condition for safeguarding the community against a repetition of criminal behavior is a careful follow-up and required attendance for psychiatric treatment over a long period of time.

*Krol,* 344 A.2d at 304.

The New Jersey Supreme Court, in *Krol,* also differentiated between individuals acquitted by reason of insanity who are conditionally released and those who are unconditionally released. The Court observed that although conditionally released acquittees are required to comply with the provisions of their release order, and to attend mental status hearings, once "the commitment order is unconditionally terminated, the defendant must be treated thereafter like any other person for purposes of involuntary commitment." *Krol,* 344 A.2d at 304.

Claimant also believes that § 402(x) only refers to the commitment of an individual immediately following a verdict of not guilty by reason of insanity, so benefits were wrongly suspended. (Claimant's Brief at 6–7). Moreover, Claimant argues that the 1994 commitment was a result of Artz being a danger to himself or others at that time, not because of any wrongdoing while he was institutionalized. In effect, the same behavior Artz exhibited in 1994, if exhibited by an individual unrelated to a criminal case, would have also resulted in a civil commitment, and would have warranted Disability Insurance Benefits. (Claimant's Brief at 6).

Claimant's argument is that his 1994 institutionalization was not "in connection with" the crime he committed in 1981, because subsequent to his conditional release, his criminal status should have been wiped clean and he should have been treated as a civil committee. Thus, he argues that he was entitled to receive his Disability Insurance Benefits during that period of time.

■ 42 U.S.C. § 402(x)(1)(A)(ii) specifies that an individual confined by court order at public expense "in connection with" a finding of not guilty by reason of insanity will not receive monthly benefits. Neither the legislative history, nor the

statute's language indicate an intent to limit the suspension of benefits to the initial hospitalization pursuant to a not guilty by reason of insanity verdict. Holding a status hearing, which is mandated by *Krol/ Fields* for conditionally released individuals acquitted by reason of insanity, is a sufficient nexus to be considered "in connection with" the original verdict or finding. The hearings are an extension of the conditional release. Artz would not have to attend the *Krol* hearings had he not committed the original crime. Moreover, it is clear from the record that Artz was, in fact, confined by court order, as a result of the hearing, as required by Section 402(x).

Claimant also argues that the Social Security Administration's Program Operations Manual System ("POMS") regulations support a continuation of Disability Insurance Benefits during the period of Artz's re-confinement. POMS regulations, much like Section 402(x), require the suspension of benefits while an individual found not guilty by reason of insanity is confined by court order in an institution at public expense in connection with a verdict or finding in a criminal case. GN 02607.001(C)(1). The POMS also specify that the suspension of benefits is lifted when confinement ends with probation or parole, or conditional/unconditional release. GN 02607.001(C)(1)(c).[3] POMS regulation GN 02607.001(C)(9) allows for the suspension of benefits to be reinstated upon reconfinement after an official determination that a condition of probation or parole was violated. Claimant argues that because the POMS do not specify that a violation of a conditional release, or a re-confinement of persons conditionally released, are grounds for reinstating the suspension of benefits, Artz is entitled to his

Disability Insurance Benefits during the time he was recommitted by court order.

Moreover, Claimant also argues that even if GN 02607.001(C)(9) did pertain to conditional releases, benefits, by definition, could not be suspended until there was an official determination that he violated the terms of his release. Artz argues there was no such official determination that he violated a condition of his release. Similarly, Claimant argues that the purpose of the mental status review is to determine if the person is a danger to himself or others, not to assess whether the conditions of the release were violated. (Claimant's Brief at 8). Claimant believes the POMS provisions should be given controlling weight. (Claimant's Reply Brief at 11). The ALJ gave proper consideration to the Social Security Administration's POMS regulations. In the present case, the POMS do not support Artz's argument. Much like 42 U.S.C. § 402(x), the POMS do not explicitly state that the suspension of benefits of individuals found not guilty by reason of insanity extend only to the commitment directly following the verdict. Although the POMS afford for the reinstatement of suspension of benefits when a prisoner violates a condition of their probation or parole, GN 02607.001(C)(9), it does not exclude the possibility of the suspension of benefits when a conditionally released acquittee is re-confined by court order.

The POMS, in essence, express the same intent Congress had in amending 42 U.S.C. § 402(x), by preventing any prisoner or committee from being doubly compensated. When an individual is not confined at public expense, he or she is

---

**3.** The POMS specify that confinement does not include when "an individual is residing outside the penal institution at no expense (other than the cost of monitoring) to such institution or the penal system or to any agency to which the penal system has transferred jurisdiction over the individual." GN 02607.001(C)(1)(d)(ii).

entitled to receive monthly benefits; however, when an individual is confined at public expense, he or she is not entitled to monthly benefits. This clearly expresses the concern that Congress had in protecting against the draining of public funds, and thus, supports the broad interpretation of 42 U.S.C. § 402(x).

## IV. Conclusion

For the foregoing reasons, this Court will affirm the Commissioner's final decision denying Claimant's application. The Court will issue an appropriate order.