

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-2003

# Artz v. Comm Social Security

Precedential or Non-Precedential: Precedential

Docket No. 02-3882

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Artz v. Comm Social Security" (2003). *2003 Decisions.* Paper 426.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/426

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 30, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3882

JAY ARTZ,

Appellant

v.

JO ANNE B. BARNHART, COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 01-cv-02004)
District Judge: Hon. Joseph E. Irenas

Argued: April 7, 2003

Before: ALITO, FUENTES and GREENBERG,
*Circuit Judges*

(Opinion Filed: May 30, 2003)

Brian G. Smith, Esq. (Argued)
Community Health Law Project, Inc.
900 Haddon Avenue, Suite 400
Collingswood, New Jersey 08108

Counsel for Appellant

Anthony J. LaBruna
Assistant U.S. Attorney
Christopher J. Christie
United States Attorney
District of New Jersey
970 Broad Street, Suite 700
Newark, New Jersey 07102

Karen T. Callahan (Argued)
Social Security Administration
Office of General Counsel - Region II
26 Federal Plaza
New York, NY 10278

Counsel for Appellee

---

**OPINION OF THE COURT**

---

ALITO, *Circuit Judge*:

   This appeal requires us to interpret and apply a provision of the Social Security Act, 42 U.S.C. § 402(x)(1)(A)(ii), that provides that disability insurance benefits and certain other benefits are not to be paid to a person who "is confined by court order in an institution at public expense in connection with . . . a verdict or finding that the individual is not guilty of [a criminal] offense by reason of insanity." Relying on this provision, the Commissioner suspended Jay Artz's claim for disability benefits for a 14-month period during which he was involuntarily confined in psychiatric institutions at public expense. The District Court affirmed the decision of the Commissioner, *Artz v. Barnhart*, 214 F. Supp.2d 459 (D.N.J. 2002), and we now affirm the order of the District Court.

I.

   Before turning to the facts of Artz's case, we will briefly discuss the provision of the Social Security Act that is at issue in this appeal, and we will summarize New Jersey's treatment of persons who are found not guilty by reason of insanity ("NGRI").

A.  Before 1994, a provision of the Social Security Act, 42 U.S.C. § 402(x)(1) (amended 1994) provided that benefits were not to be paid to felons while incarcerated unless they were actively and satisfactorily participating in an approved rehabilitation program and were expected to be able to engage in substantial gainful activity upon release and within a reasonable time. In 1994, Congress broadened this prohibition to apply to several other categories of persons who are institutionalized at public expense following criminal proceedings. 42 U.S.C. § 402(x)(1)(A). Specifically, as amended in 1994 and as it now stands, the statute applies to any person who

> (i)  is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of a criminal offense,

> (ii) is confined by court order in an institution at public expense in connection with —

> (I) a verdict or finding that the individual is guilty but insane, with respect to a criminal offense,

> (II) a verdict or finding that the individual is not guilty of such an offense by reason of insanity,

> (III) a finding that such individual is incompetent to stand trial under an allegation of such an offense, or

> (IV) a similar verdict or finding with respect to such an offense based on similar factors (such as a mental disease, a mental defect, or mental incompetence), or

> (iii) immediately upon completion of confinement as described in clause (i) pursuant to conviction of a criminal offense an element of which is sexual activity, is confined by court order in an institution at public expense pursuant to a finding that the individual is a sexually dangerous person or a sexual predator or a similar finding.

The House Committee Report provided the following explanation for including persons found not guilty by reason of insanity within this prohibition:

> Social Security is intended to replace earnings and provide basic income for food, clothing and shelter to

> workers who retire or become disabled. Individuals who have been committed to an institution pursuant to committing a crime are already relying on public funds to cover the costs of their basic living expenses. It is particularly inequitable that, in some instances, criminally insane individuals so institutionalized receive higher benefits than their victims or their victims' survivors . . . .
>
> In making these changes, the Committee is seeking to establish greater consistency in the policy that Congress enacted in 1980 banning Social Security benefit payments to incarcerated felons. That limitation recognizes that prisoners receive full support from public resources in the form of food, clothing, lodging, and basic health care. In the Committee's view, the same situation exists in the case of criminally insane individuals who are confined to institutions at public expense.

H.R. Rep. No. 103-491 (1994), 1994 U.S.C.C.A.N. 3266, 3268, 3273.

B. In *State v. Krol*, 344 A.2d 289 (N.J. 1975), the New Jersey Supreme Court endorsed the broad principle that the standard for the involuntary commitment of persons found NGRI should be substantially the same as that applied to others who are civilly committed. *Id.* at 297-99. The Court then prescribed procedures to implement this principle. Under *Krol*, when a defendant is found NGRI, the criminal court may order that the defendant "be confined in a suitable mental institution for a period of 60 days for observation and examination." *Id.* at 300. The *Krol* Court continued:

> Within this period, the State may move for indefinite commitment on the ground that defendant is mentally ill and, if permitted to remain at large in the general population without some restraints, is likely to pose a danger to himself or to society. If, following a hearing, the court finds that the State has shown by a preponderance of the evidence that defendant is mentally ill and is likely to pose such a danger, it should order suitable restraints placed upon

> defendant's liberty so as to protect the public and provide defendant with appropriate treatment.

*Id.* (footnotes omitted). The Court added that orders requiring institutionalization or lesser restraints may be modified upon proper proof by a preponderance of the evidence by the party seeking modification. *Id.* at 303-04. "Once, however, [a] commitment order is unconditionally terminated the defendant must be treated thereafter like any other person for purposes of involuntary commitment." *Id.*

In *State v. Fields*, 390 A.2d 574 (N.J. 1978), the state supreme court imposed additional requirements. The *Fields* Court held that persons who are civilly committed after a verdict of NGRI are entitled to periodic review of the continued validity of the restraints on their liberty and that the state must bear the same burden of proof at these proceedings as it bore when the person was first committed. *Id.* at 580. The *Krol* and *Fields* procedures are now codified by statute and court rule. *See* N.J.S.A. 2C:4-8; N.J. Court Rules 3:19-2 and 4:74-7.

Under the New Jersey procedures, NGRI acquittees are generally treated the same as others when civil commitment is initially sought and when a periodic review proceeding is held, but there are some differences. "[W]hat is required is not absolute equality, but 'substantial equality.'" *In the Matter of the Commitment of Edward S.*, 570 A.2d 917, 922 (N.J. 1990). "Indeed, the cases note that there *are* differences." *Id.* at 923 (emphasis in original). Perhaps most importantly, the burden of proof differs. In most civil commitment proceedings, it must be shown by clear and convincing evidence that "mental illness causes the person to be dangerous to self or dangerous to others or property." N.J. Court Rule 4:74-7(f)(1). In the case of a person who has been found NGRI, however, "during the maximum period of imprisonment that could have been imposed, as an ordinary term of imprisonment, for any charge on which the defendant has been acquitted by reason of insanity," a preponderance of the evidence burden applies. N.J.S.A. 2C: 4-8. *See also Krol*, 344 A.2d at 300 & n.9. Furthermore, "the fact that [an NGRI acquittee] has actually engaged in dangerous conduct otherwise criminal should weigh heavily

in [a] court's assessment of the need for the continued imposition of restraints upon his liberty." *Fields*, 390A.2d at 587. In addition the prosecutor has a statutory right to appear in any proceeding regarding the commitment or discharge of an acquittee following an NGRI verdict and in any subsequent periodic review. N.J.S.A. 2C:4-8b(3). And when an NGRI murder acquittee seeks release into the community, the proceeding must generally be open to the public. *In the Matter of Commitment of Edward S., supra.*

C.  Artz has a long history of mental illness. *See Artz*, 214 F. Supp.2d at 461. In 1981, Artz was arrested for the murder of his mother, but he was found NGRI, and his case was then handled in accordance with the procedures summarized above. He was confined by the criminal court for 60 days for observation and evaluation. After that evaluation, it was determined that he was a danger to himself or others. He was therefore involuntarily committed to the Ancora Psychiatric Hospital, and his status was reviewed as required by *Fields*. In June of 1989, following such a review, a New Jersey Superior Court Judge ordered that Artz be released from the Ancora facility on certain conditions, including the following: that he refrain from drinking alcohol and using illegal controlled substances; that he take prescribed psychoactive medications; that he attend regular counseling sessions; and that he remain available for monitoring and evaluation. App. at 144-46.

As a result of this continued monitoring and evaluation, Artz was readmitted to the Ancora facility from July 7 to 20, 1993, and from February 23 to March 30, 1994. *Id.* at 149. On July 22, 1994, he was committed to another psychiatric hospital after a judicial determination that he posed a danger to himself and others because he was no longer taking his medication. On March 14, 1995, Artz was transferred to the Ancora facility. He was conditionally released on April 10, 1996.

In January 1982, while confined in the Ancora facility, Artz applied to the Social Security Administration ("SSA") for disability benefits. *Id.* at 47-50. His claim was initially denied, but he filed a request for reconsideration. *Id.* at 51-57. This too was denied. *Id.* at 58-59. Artz then requested a hearing before an ALJ. *Id.* at 51-53. In January of 1983,

the ALJ issued a favorable decision and order. The ALJ found that Artz suffered from "a severe impairment, and [was] unable to perform his prior work activity, or any other relevant work-related activity in the local and national economy." *Id.* at 135. The ALJ decided that Artz was entitled to disability benefits and to a period of disability commencing on December 31, 1980. *Id.* at 136. Because of Artz's mental condition and his confinement in Ancora Psychiatric Hospital, the ALJ recommended that a representative payee be appointed. *Id.*

In March 1995, Artz was informed by the SSA that his benefits were being suspended while he was confined in an institution at public expense. *Id.* at 138-39. Artz filed a request for reconsideration, but the SSA denied the request citing the previously noted amendment to 42 U.S.C. § 402(x) that had taken effect on February 1, 1995. App. at 142-43. Artz requested a hearing and, in March 1998, he appeared before an ALJ. *Id.* at 29-46. In June 1999, the ALJ decided that, pursuant to the amendment to 42 U.S.C. § 402(x), Artz's benefits had been properly suspended by the Commissioner because Artz's involuntarily confinement between February 1, 1995, and April 10, 1996, was "in connection with" his 1981 NGRI verdict. App. at 19-20. The Appeals Council of the SSA denied Artz's request for review of the ALJ's decision. *Id.* at 4-5. Artz sought review in the United States District Court for the District of New Jersey, but the District Court affirmed the decision denying Artz's claim. *Artz*, 214 F. Supp.2d at 468. The District Court based its decision on the language of Section 202(x) and also noted the congressional intent to avoid double payment of public funds in the form of benefits to individuals who are institutionalized at the public expense following a verdict of NGRI. Artz then took the present appeal.

## II.

Artz argues that his benefits were improperly suspended because during the time in question he was not confined "in connection with" the verdict of NGRI but was instead confined as a result of a normal civil commitment proceeding. Artz argues that the only connections between

the NGRI verdict and the order under which he was committed during the time in question are that "they both happened to Mr. Artz and they both had the same case number." Appellant's Br. at 14. "These connections," he adds, "are not what is contemplated in the statute." *Id.*

A. In analyzing Artz's argument, we begin with the key statutory phrase "in connection with" the NGRI verdict. In *United States v. Loney*, 219 F.3d 281, 284-85 (3d Cir. 2000), we considered the meaning of the phrase "in connection with," and although the context was different — in *Loney*, we were interpreting a provision of the Sentencing Guidelines, U.S.S.G. § 2K2.1(b)(5) — our discussion there is instructive. Stating that we should interpret the phrase in accordance with "ordinary usage," we concluded that the phrase should be interpreted " 'broadly,' " " 'expansively,' " and "as covering a wide range of relationships." *Loney*, 219 F.3d at 284 (citations omitted). We observed that the phrase "expresses some relationship or association, one that can be satisfied in a number of ways such as a causal or logical relationship." *Id.* We added:

> We do not attempt to provide an exhaustive list of relationships that will resolve every case. As other courts have observed, 'no simple judicial formula can adequately capture the precise contours of the 'in connection with' requirement, particularly in light of the myriad factual contexts in which the phrase might come into play.

*Id.* (citation omitted).

In light of this discussion of the ordinary meaning of the phrase "in connection with," we hold that the phrase is more than broad enough to apply in the present case. Artz was confined during the months at issue (February 1995 to April 1996) pursuant to a court order that was issued on July 22, 1994, and that formed a link in a tight chain of events stretching back to the NGRI verdict. As previously noted, that verdict led immediately and directly to a period of confinement for evaluation, and as a result of that evaluation, Artz was civilly committed in August 1981. He was conditionally released from this confinement in June 1989, and one of the conditions of his release was that he

take the medication that was prescribed for him. After several shorter periods of re-confinement for failure to abide by conditions of release, the July 22, 1994, commitment order was issued based on the conclusion that he posed a danger to himself and others because he was no longer taking his medication. This sequence establishes a nexus that is sufficient to satisfy the *Loney* Court's understanding of the ordinary meaning of the phrase "in connection with."

Moreover, when Artz was committed in July 22, 1994, his prior NGRI verdict had a significant effect on the test that the judge was required to apply. Due to the prior verdict, the judge was required to find only that a preponderance of the evidence, not clear and convincing evidence, established that he presented the requisite danger. This link too is ample to satisfy *Loney*.

B. Artz asks us to read the statutory language more narrowly. According to Artz, a civil commitment meets the "in connection with" requirement only if "the hospitalization . . . immediately follows the NGRI verdict." Appellant's Br. at 14. In his case, he argues, the covered period was "from August of 1981 [when he was civilly committed following his criminal trial] to June of 1989 [when the Superior Court ordered his conditional release]." *Id.* We find this argument unconvincing.

First, we see no basis for interpreting the broad phrase "in connection with" to mean "immediately follow[ing]." That is not what the phrase connotes in ordinary usage, and we see no basis for giving the phrase that special meaning here. Second, Artz's concession that his confinement from August 1981 to June 1989 was "in connection with" the NGRI verdict undermines his central argument that he was confined during the period at issue in this case pursuant to what was in essence an ordinary civil commitment. Artz's commitment was ordered in August 1981 pursuant to the same standard — proof of dangerousness by a preponderance of the evidence — as his re-confinement in 1994. Moreover, the 1981 order, like the 1994 order, was based on Artz's condition at the time in question. Thus, if the 1981 commitment was "in connection with" the NGRI verdict, we think that the same is true of the 1994 re-commitment.

C. This interpretation of 42 U.S.C. § 402(x) is supported by the Social Security Administration's Program Operations Manual System ["POMS"], "the publicly available operating instructions for processing Social Security claims." *Wash. Dept. of Social Servs. v. Keffeler*, 123 S.Ct. 1017, 1025 (2003). "While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect." *Id.* at 1026. POMS GN 02607.310 provides as follows:

> NOTE: Some jurisdictions have special procedures for re-confining NGRI individuals (i.e., insanity acquittees) on conditional release which differ from usual civil commitment procedures. If a court orders the individual re-confined under these special procedures, consider the NGRI individual confined "in connection with" the NGRI verdict or finding.

Because the procedures applicable when Artz was re-confined in 1994 differed from normal civil commitment procedures in the ways already explained, this provision supports the suspension of Artz's benefits.

In sum, we hold that Artz was confined at public expense "in connection with" his prior NGRI verdict and that his benefits were therefore correctly suspended for the period in question. Accordingly, the order of the District Court is affirmed.

A True Copy:
Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*