**Diane M. BITSACOS, Plaintiff**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant**

**No. CIV.A.04–30118–KPN.**

United States District Court,
D. Massachusetts.

Jan. 21, 2005.

William G. Cullinan, O'Connor Martinelli, Cohn, Pikula, & Cullinan, Springfield, MA, for Diane Bitsacos, Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Jo Anne B. Barnhart, Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE and DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 6 and 10)*

NEIMAN, United States Magistrate Judge.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Supplemental Security Income ("SSI") and Social Security Disability Insurance ("SSDI") benefits. *See* 42 U.S.C. § 405(g) and 1383(c)(3). Diane M. Bitsacos ("Plaintiff") alleges that the Commissioner's decision denying her these benefits—which was memorialized in a February 25, 2004 decision by an administrative law judge—is not based on substantial evidence of record and is predicated upon errors of law. Plaintiff has moved to reverse or, in the alternative, to remand the decision, and the Commissioner, in turn, has moved to affirm.

The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73(b). For the reasons set forth below, the court will allow Plaintiff's motion insofar as it seeks a remand and, therefore, will deny the Commissioner's motion to affirm.

## I. STANDARD OF REVIEW

The Commissioner's factual findings in making her disability determination are conclusive so long as they are grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is "more than a mere scintilla." *Id.* Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d

765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

■ Even so, a denial of disability benefits need not be upheld if there has been an error of fact or law in the evaluation of the particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter ... a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand[ ] the cause for a rehearing." 42 U.S.C. 405(g).

## II. Background

Plaintiff was born on March 1, 1951, received a B.A. degree from American International College and has past relevant work as a bookkeeper, general ledger clerk, food service worker and manager, and ticket seller in the gaming industry. (Administrative Record ("A.R.") at 28–29, 40.) Plaintiff asserts that she is disabled because of hearing loss and depression, with an onset date of July 4, 1999. (A.R. at 222–33, 393–96.)

### A. *Medical History*

Plaintiff was treated at Ear, Nose and Throat Associates from 1999 through 2003 for a history of progressive hearing loss. (A.R. at 296–98, 381.)[1] In October of 2001, Dr. Robert Osofsky reported that Plaintiff "would have a great deal of difficulty in speech communication" without the use of hearing aids, but that with bilateral hearing aids she could communicate "moderately well" as long "as the environment [was] quiet." (A.R. at 339–41.) In November of 2002, Dr. Osofsky reported that Plaintiff's condition was permanent. (Tr. 385.) One year later, in November of 2003, Plaintiff had an audiological exam at Keenan, Malladi & O'Neill; speech discrimination was 40 percent in her right ear and 32 percent in her left. (A.R. at 392). This last test was conducted without hearing aids. (A.R. at 159.)

### B. *Consultative Physical Examinations*

In July of 2001, after Plaintiff had applied for both SSI and SSDI benefits the previous May, a consultative examination was conducted by Dr. Daniel Dress, who reported Plaintiff's complaints of headaches, hearing problems and hand, foot and back pain. Plaintiff's medications at the time were Serzone and Zoloft for depression; she also smoked a pack of cigarettes and drank three to four glasses of wine per day. Upon physical examination, Plaintiff's reflexes and motor strength were normal, the range of motion in her back was unimpaired, her gait was normal and there were no limitations noted in her ability to lift, bend and walk. Plaintiff was assessed with a hearing deficit, but with the ability to hear normal conversation

---

1. In June of 1999, Plaintiff's speech reception threshold was measured at 45 decibels (db) bilaterally and her speech discrimination at 76 percent in her right ear and 64 percent in her left. (A.R. at 198.) One year later, her speech reception threshold was measured at 50 db bilaterally and her speech discrimination at 52 percent in her right ear and 56 percent in her left. (A.R. at 197.) In June of 2001, her speech reception threshold was measured at 50 db in her right ear and 45 in her left; speech discrimination was 68 percent in her right ear and 52 percent in her left. (A.R. at 381.) In October of 2001, Plaintiff's speech reception threshold was measured at 45 db in her right ear and 50 db in her left; speech discrimination was 52 percent in her right ear and 44 percent in her left. (A.R. at 339–41.) One year later, her speech reception threshold was measured at 45 db bilaterally; speech discrimination was 60 percent in her right ear and 20 percent in her left. (A.R. at 380–81.) Still later, as described *infra*, Plaintiff's speech discrimination in her right ear fell to 40 percent.

with the use of hearing aids. (A.R. at 312–14.)

## C. *Psychiatric Examinations*

Plaintiff has also been treated for depression, most recently in October of 2002 by Dr. Douglas Williams. At the time, Dr. Williams noted that Plaintiff developed headaches and fatigue in settings with background noise. (A.R. at 389.)

Previously, however, in August of 2001, Dr. Michael Bohnert conducted a psychiatric evaluation of Plaintiff. Dr. Bohnert noted that Plaintiff understood his questions as long as he looked directly at her when speaking and found no signs of mental abnormality. Eventually, he diagnosed chronic dysthymia and a possible mild personality disorder, as well as the need to rule out alcohol abuse. (A.R. at 315–20.)

## D. *Mental and Physical Assessments*

In August of 2001, Dr. Menachem Kasdan, a state agency reviewing psychologist, concluded that Plaintiff had moderate limitations in (1) maintaining concentration and attention for extended periods, (2) completing a normal workday and workweek without interruption from psychologically based symptoms, (3) interacting appropriately with supervisors, and (4) responding to changes in a work setting. (A.R. at 335–36.) Dr. Kasdan concluded that Plaintiff could handle simple as well as reasonably complex work, maintain concentration and attention adequately for two-hour periods, and handle simple routine levels of stress. (A.R. at 337.) In February of 2002, yet another state agency psychologist, a Dr. Peter Robbins, concurred with Dr. Kasdan's assessment of Plaintiff's mental abilities and limitations. (A.R. at 373–76.)

In November of 2001, Dr. G. Chase, a state agency reviewing physician, concluded that Plaintiff's primary diagnosis was hearing loss and that she did not suffer from any listed impairment. Dr. Chase noted that Plaintiff could not work in a job which required good hearing and excellent speech capacity. (A.R. at 343–50.) In February of 2002, Dr. B. Stewart, another reviewing physician, concluded that Plaintiff could do light work which did not involve exposure to hazards. (A.R. at 351–58.)

## E. *Procedural History*

As indicated, Plaintiff applied for both SSDI and SSI benefits in May of 2001. Her applications were denied initially and upon reconsideration. (A.R. at 161, 397; 163, 402.) On April 23, 2003, following a hearing, an administrative law judge ("ALJ") issued a written decision that Plaintiff was not disabled. (A.R. at 35–48.) On July 2, 2003, however, the Appeals Council vacated that decision and remanded the matter for a further hearing. (A.R. at 206–08.) The Appeals Council directed the ALJ to (1) give further consideration to Plaintiff's maximum functional capacity and to provide an appropriate rationale with regard to her alleged difficulties using a telephone and communicating with others and (2) obtain supplemental evidence from a vocational expert regarding the effect of the assessed limitations on her occupational base. (*Id.*)

The remanded hearing was held on November 14, 2003. On February 25, 2004, the ALJ again found that Plaintiff was not disabled. (A.R. at 16–29.) The Appeals Council denied Plaintiff's request for further review (A.R. at 8–10), making the ALJ's decision final and subject to judicial review under 42 U.S.C. § 405(g).

## III. DISCUSSION

An individual is entitled to SSDI benefits if, among other things, she has an

insured status and, prior to the expiration of that status, was under a disability. *See* 42 U.S.C. § 423(a)(1)(A) and (D). SSI benefits, on the other hand, require a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff's need, for purposes of SSI, and insured status, for purposes of SSDI, are not challenged. The only question is whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer from a disability.

### A. DISABILITY STANDARD AND THE ALJ'S DECISION

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). *See also* 42 U.S.C. § 1382c(a)(3)(A) (similar). An individual is considered disabled under the Act

> only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for him, or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

First, is the claimant currently employed? If s[he] is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimants physical or mental capacity to perform basic work-related functions." If s[he] does not have an impairment of at least this degree of severity, s[he] is automatically not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth, ... does the claimant's impairment prevent [her] from performing work of the sort he has done in the past? If not, s[he] is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent [her] from performing other work of the sort found in the economy? If so, s[he] is disabled; if not s[he] is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability on July 4, 1999 (question one); that she had impairments that were "severe," *i.e.*, bilateral neurosensory hearing loss, tinnitus, depression, and left arm weakness post breast surgery, although not severe enough to be listed in Appendix 1 (questions two and three); but that Plaintiff was not prevented from performing her past relevant work (question four). (A.R. at 28–29.) As a result, the ALJ, without reaching question five, concluded

that Plaintiff did not suffer from a disability. (*Id.*)

## B. Plaintiff's Challenge To The ALJ's Decision

Plaintiff claims that the ALJ's decision is not based on substantial evidence of record and is predicated on errors of law. Specifically, Plaintiff argues that the ALJ (1) failed to properly consider the combination of her impairments, (2) improperly rejected as not credible her claim of fatigue, (3) erroneously relied on the "ambiguous testimony" of the vocational expert, and (4) failed to properly evaluate her audiologic test of November 6, 2003.

After reviewing the record, the court finds the first three arguments unpersuasive. Assuming for the moment that the ALJ properly evaluated the November 6, 2003 audiologic test, the focus of Plaintiff's fourth argument, the court concludes that the ALJ did in fact consider the cumulative effect of Plaintiff's impairments, properly considered the vocational expert's testimony and did not erroneously address Plaintiff's credibility.

■ As an initial matter, Plaintiff's claims that the ALJ failed to consider the impact of her combined impairments or assess her claim of disabling fatigue is without merit. The ALJ expressly considered the various impairments individually and in combination. (See A.R. at 26–27.) Moreover, the ALJ provided an adequate basis for assessing Plaintiff's credibility. As Plaintiff is no doubt aware, the resolution of conflicts in evidence and credibility determinations are for the Commissioner, not for doctors or the courts. *See Evangelista v. Sec'y of Health & Human Servs.,* 826 F.2d 136, 141 (1st Cir.1987); *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir.1981). Here, Plaintiff's complaint of disabling fatigue was simply not supported by the medical record. No treating, examining or reviewing doctor suggested that fatigue interfered with Plaintiff's ability to perform light work. And although Dr. Williams indicated that the stress of being in noisy environments would cause Plaintiff to feel fatigued, he did not suggest that she would suffer from significant fatigue if she were not in such an environment. (A.R. at 389.)

■ Similarly, the ALJ properly analyzed and relied on the testimony of the vocational expert. (See A.R. at 154.) The ALJ found that Plaintiff's past work, particularly her work as a general ledger clerk, (1) was typically performed at the light level in the national economy, (2) did not involve even moderate exposure to hazards, (3) required less than occasional reaching with her left arm, (4) did not require use of the telephone and took place in a quiet work setting, (5) did not require extended concentration for more than two hours at a time, and (6) involved a supportive work setting. (A.R. at 28–29.) In addition, before concluding that Plaintiff could perform such work, the ALJ ascertained her residual functional capacity both for mental and physical activities, capacities supported by the opinions of the reviewing psychologists and physicians. (A.R. at 335–37, 343–58, 373–76.) The reviewers' assessments were consistent with the medical evidence and, thus, could be relied upon when, as here, they represented a reasonable reading of the relevant medical evidence. *See* 20 C.F.R. §§ 404.1527(f) and 416.927(f) (2005).

■ The court, however, finds merit in Plaintiff's fourth argument, that the ALJ failed to properly evaluate the November 6, 2003 audiologic test. That test determined that Plaintiff's speech discrimination in her right ear had been reduced to 40 percent. (A.R. at 392.) The 40 percent threshold is important because the listed impairments—specifically Listing 2.08B—include "[h]earing impairments (hearing

not restorable by a hearing aid) manifested by ... [s]peech discrimination scores of 40 percent or less in the better ear." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 2.08B (2005). As indicated, if a claimant has an impairment severe enough to be listed, the claimant is deemed disabled.

Here, the ALJ determined that Plaintiff did not meet Listing 2.08B because the audiologic test was done without hearing aids. This, in Plaintiff's view, reflects a misreading of Listing 2.08B. The listing's parenthetical phrase, "hearing not restorable by a hearing aid," Plaintiff contends, requires that the test be given, as it was here, *without* hearing aids. Alternatively, Plaintiff argues, she should be given the opportunity on remand to have the test administered *with* hearing aids to see if her speech discrimination would indeed improve beyond the 40 percent threshold.[2]

The court finds the first part of Plaintiff's argument, that the audiologic test should have been done without hearing aids, unpersuasive. As Social Security Administration Program Operations Manual System ("POMS") § DI 24535.010, entitled "Evaluation of Hearing Impairments," makes clear, Listing 2.08B usually calls for *testing to be conducted* "with a hearing aid in place." (Document No. 13, Exhibit.)[3] Granted, testing without hearing aids can occur in certain exceptional situations.[4] However, none of those situations, at least insofar as the parties are concerned, applies here.

To be sure, as the Commissioner acknowledges, the POMS do not have binding legal force, although courts frequently consider them when interpreting the SSA's statutory and regulatory policies. *See, e.g., Hartfield v. Barnhart,* 384 F.3d 986, 988 (8th Cir.2004); *Artz v. Barnhart,* 330 F.3d 170, 176 (3rd Cir.2003); *Stroup v. Barnhart,* 327 F.3d 1258, 1262 (11th Cir. 2003). *See also Washington State Dep't of Social & Health Servs. v. Guardianship*

---

2. Plaintiff also points out that Dr. Osofsky had previously determined that "[e]ven with the use of hearing aids, [Plaintiff] could still have significant difficulty in speech discrimination. Hearing aids would be of limited benefit." (A.R. at 339.) What Plaintiff omits, however, is Dr. Osofsky's further statement that her "poor discrimination scores would make the amplification from hearing aids give her an increased amount of sound, but she could still have problems with background noise." (*Id.*)

3. Specifically, POMS § DI 24535.010 provides that "[t]he listing criteria are, with one exception,' based on how an individual hears with a hearing aid. Therefore, to determine that an impairment meets ... [Listing] 2.08 ..., we usually need the results of hearing testing performed with a hearing aid in place (aided hearing testing)." (Exhibit to Document No. 13 at paragraph B(1).)

4. In pertinent part, POMS § DI 24535.010 continues as follows:

Although [L]isting[ ] 2.08 ... [is] generally based on aided hearing testing, there are situations in which unaided hearing testing

can establish that a hearing loss is of listing-level severity.

a. For adults, a hearing loss can be found to be of listing-level severity when valid testing without a hearing aid reveals, in the better ear:

● A profound loss of hearing (both air conduction and bone conduction threshold sensitivity are at the levels in Listing 2.08A) *and* speech discrimination scores are at the level in Listing 2.08B.

● A profound loss of hearing (both air and bone conduction threshold sensitivity are at the levels in Listing 2.08A), *and* speech discrimination testing could not be completed due to the high decibel level needed.

● A profound loss of hearing (both air and bone conduction threshold sensitivity are at the levels in Listing 2.08A), *and* the evidence shows the treating source no longer conducts speech discrimination testing due to the high decibel level needed or the individual's inability to communicate effectively.

(Document No. 13, Exhibit ¶ B(3)(a) (emphasis in original).)

*Estate of Keffeler,* 537 U.S. 371, 385, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (noting that while POMS "are not products of formal rulemaking, they nevertheless warrant respect"). The First Circuit, too, has cited POMS policy in this manner, *see Rose v. Shalala,* 34 F.3d 13, 17 (1st Cir. 1994), as has this court, *see Reeves v. Barnhart,* 263 F.Supp.2d 154, 162–63 (D.Mass.2003); *Kiedos v. Apfel,* 45 F.Supp.2d 80, 85 (D.Mass.1999); *Creamer v. Callahan,* 981 F.Supp. 703, 704 (D.Mass. 1997).

Here, the POMS policy appears to reasonably interpret Listing 2.08B in a manner consistent with regulatory requirements. Thus, Plaintiff's argument—that the results of the audiologic test, unaided by hearing aids, meets the listing—obviously falls short. That, however, does not necessarily resolve Plaintiff's contention that a remand should be ordered so that she may undergo the tests with hearing aids in place.

As might be expected, the Commissioner argues against remand. No further hearing test is warranted, the Commissioner maintains, because the evidence of record shows that the use of hearing aids actually improves Plaintiff's ability to understand spoken conversation, even if such use does not fully restore her capacity to understand conversations under less than ideal conditions. Moreover, the Commissioner asserts, a test *with* hearing aids would likely exceed the listing level since Plaintiff's speech discrimination barely met the 40 percent level *without* the use of a hearing aid.

The court, however, is convinced that a remand is appropriate. In essence, the court is unwilling to speculate about what a remanded audiologic test might demonstrate. For one thing, it appears that Plaintiff's speech discrimination levels have been deteriorating over the years. See n. 1, *supra.*[5] Second, and more importantly, the court is unwilling to accept the assumptions underlying the Commissioner's argument. In other words, there is no way of knowing whether a test with the use of hearing aids will in fact demonstrate any better an ability on Plaintiff's part to discriminate speech. Of course, if a new test with hearing aids shows speech discrimination at greater than 40 percent in Plaintiff's good ear, the matter would most likely end for, as described, the other grounds proffered by Plaintiff for reversal are unavailing. On the other hand, if the test shows speech discrimination at 40 percent or less, the only question before the administrative law judge, it would seem, would be the onset date of Plaintiff's listed impairment.[6]

### IV. CONCLUSION

For the reasons stated, Plaintiff's motion to remand is ALLOWED and the Commissioner's motion to affirm is DENIED. The case is remanded for further action in accord herewith.

IT IS SO ORDERED.

---

**5.** While Plaintiff proffers new evidence suggesting a worsening of her condition, (see Exhibit to Document No. 7), she fails to meet, let alone address, the standards for remand based on such evidence. *See Evangelista,* 826 F.2d at 139 (holding in SSDI case that new evidence must be not only "new" and "material," but that there must be "good cause" for failing to present such evidence to the administrative law judge) (citing 42 U.S.C. § 405(g)); 42 U.S.C. § 1383(c)(3) (indicating that standards are the same for SSI cases). Thus, the court has not considered this "new" evidence in making its decision.

**6.** The court is unaware of the date through which Plaintiff is insured for purposes of SSDI.